**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 21 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

JOHN F. APTT and DOUGLAS M.
MURPHY,

    Defendants-Appellants.

Nos. 02-1555 & 03-1028

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 99-CR-418-N)**

---

Brian K. Holland, Holland & Pagliuca, P.C., Denver, Colorado, for Defendant-
Appellant John F. Aptt.

Sean Connelly, Hoffman Reilly Pozner & Williamson LLP, Denver, Colorado, for
Defendant-Appellant Douglas M. Murphy.

James C. Murphy, Assistant United States Attorney (John W. Suthers, United
States Attorney; John M. Haried and Valeria Spencer, Assistant United States
Attorneys, with him on the brief), Denver, Colorado, for Plaintiff-Appellee.

---

Before **EBEL**, **ANDERSON**, and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

This is the consolidated appeal of two criminal defendants, John Aptt and Douglas Murphy, who were convicted in 2001 on various counts of conspiracy, fraud, and money laundering. From March 1994 to May 1997, Mr. Aptt ran an investment business, Financial Instruments Corporation. Starting in the summer of 1995 and until the two had a falling-out in 1996, Mr. Murphy was his right-hand man. The company took in almost $14 million from investors by promising them exorbitant returns, including periodic "Double Your Money" offerings bearing a staggering 100% interest rate. They actually did pay the promised returns to earlier investors, thus instilling confidence in the company and spurring further investment. According to the company's business plan, the high returns were made possible because of Mr. Aptt's "exemplary" business judgment, and because Financial Instruments had the "mechanisms in place . . . [to] keep [it] in touch with developments as they happen," thus making it possible to "seek investment opportunities and potential on a global scale." Trial Ex. 358, at 2, 4. Unfortunately for the later investors, though, the more immediate reason for Financial Instruments Group's prodigious "success" was that it paid former investors with later investors' money, in a classic Ponzi scheme.

Early in 1995, some of Mr. Aptt's promotional materials attracted the attention of Donald Deagle, an attorney in the Enforcement Division of the Securities and Exchange Commission. Mr. Deagle brought Mr. Aptt in for an

informal discussion in which he told Mr. Aptt that Financial Instruments' activities constituted an offer to sell an unregistered security, and that Mr. Appt would need to work with a securities lawyer if he wanted to make a legal offering. Mr. Deagle also intimated that given the high yields Mr. Aptt was promising, and given the small amount of seed money ("about $4,000") with which he was starting, Mr. Aptt must be contemplating a Ponzi scheme. Mr. Deagle explained to Mr. Aptt what a Ponzi scheme was, and warned him that such a scheme would be illegal. Though he had in fact already raised more than $180,000 from investors, Mr. Aptt assured Mr. Deagle that he was not operating a Ponzi scheme, that he had not yet made any sales, and that the process was so complicated that he intended to give up the whole idea of offering an investment. Based on those misrepresentations, the SEC dropped its investigation.

But Mr. Aptt did not do as he had promised. Instead, he continued to solicit investments in Financial Instruments at an ever-increasing pace, still with no real business activity to generate the profits needed to repay investors. He knew that he had to find a source of profits quickly, and brought on Mr. Murphy in the summer of 1995 to help him do so.

In October of 1995, Mr. Aptt's continued solicitations came to the attention of Mr. Deagle, and he again met with Mr. Aptt. This time Mr. Aptt was represented by counsel, Bob Lees, who assured Mr. Deagle that Mr. Aptt's

violations to that point had been a result of a misunderstanding. The SEC again agreed not to pursue an enforcement action, but only because Mr. Aptt and his attorney assured Mr. Deagle that all sales activity would stop until Mr. Lees had been able to perform the due diligence necessary for a legal offering. Mr. Lees also promised that, if there were any further compliance problems, he would withdraw as Mr. Aptt's attorney and notify Mr. Deagle of his withdrawal. Mr. Lees testified at trial that both before and after the October meeting with the SEC, he discussed with Mr. Murphy (his initial contact at Financial Instruments) the need for all investor activity to cease pending such an investigation, with no objection from Mr. Murphy. As a result of his due diligence investigation, Mr. Lees concluded in early 1996 that because neither the company nor Mr. Aptt could pass due diligence, the freeze on soliciting new investment would have to remain in place until Mr. Aptt could find a legitimate joint venturer who could qualify to make the offering.

But Mr. Aptt and Mr. Murphy could not afford to stop solicitations. With debts to investors constantly coming due and no legitimate source of profits, to do so would be to default on, and potentially to be liable for, hundreds of thousands of dollars in debt. To avert this crisis, Financial Instruments made another "Double Your Money" offering in December of 1995, in flagrant violation of the instructions of both the SEC and Mr. Lees.

But that was merely a stopgap measure, not a permanent solution to the company's problems. In a memo apparently written to Mr. Aptt in early 1996, Mr. Murphy and his recently-hired brother Bruce, a disbarred attorney, proposed the following solution: They would migrate the business to a new corporate shell untainted by the SEC investigation, and then go back into the capital markets "with enough disclosure to keep regulators at bay" for long-term, lower-interest debt. Trial Ex. 352 at 2. The funds thus acquired would be used to retire the most onerous of the company's existing debts and acquire some profitable assets. According to their estimates, if the company could solicit $2.4 million in new investments at an 18% interest rate, it could pay off $1 million in existing debt and still repay new investors so long as it was able to get a return of around 30% on the remaining $1.4 million.

In early 1996, the three began to execute the memo's proposed plan. Behind the back of Mr. Lees, they formed several new corporate entities to be vehicles for further offerings. While they kept working with Mr. Lees on the possibility of a joint venture, Mr. Murphy contacted another securities lawyer named Peter Adolph, without mentioning the company's troubles with the SEC, about the possibility of making an unregistered offering under an exemption for commercial paper. Throughout 1996 and until the company finally closed in the spring of 1997, Financial Instruments made various debt and equity investment

offerings through the new entities.

In a vain attempt to generate the income to cover its spiraling debt, Financial Instruments sank roughly $5 million of the raised funds into Costa Rican investments that Mr. Murphy had identified as promising, and Mr. Murphy continued to research other projects elsewhere in Central and South America. To run the Costa Rican operation, Mr. Aptt turned to a carpenter and friend by the name of David Gallegos, with whom he had worked on several construction projects in Colorado. The operation attempted to make the astronomical profits that were needed through two principal activities: First, it attempted to capitalize on a housing shortage in Costa Rica by building middle-income and luxury housing units and providing high-interest financing for the buyers. Second, it purchased a small company named Prestel that allowed consumers to purchase telephone service on credit, paying in installments. Both projects were abysmal failures. While the company built a total of about 200 housing units, none were sold prior to its liquidation, and indeed the company lacked clear title to many of the properties. Prestel also failed to generate significant income because many of its customers simply stopped making their payments.

Thanks to an anonymous tip that the company was running a massive Ponzi scheme, the SEC finally brought a civil enforcement action against Financial Instruments in early 1997. As a result, the federal court for the District of

Colorado entered an injunction against the company's continued operation, and transferred control to a court-appointed lawyer for liquidation. That liquidation recovered only about $1.8 million of the $13.5 million in outstanding debt to investors.

The SEC subsequently referred the matter to the U.S. Attorney's office for criminal prosecution. John Aptt and Bruce Murphy pleaded guilty to counts of mail fraud and money laundering in violation of 18 U.S.C. §§ 1341 and 1956; Doug Murphy went to trial. He had been somewhat less directly involved with the sale of securities than the other two, dealing with investors only when others were out of the office, and his day-to-day involvement in the scheme ceased when he was fired in the summer of 1996 after a heated exchange with Mr. Aptt. Nevertheless, a jury convicted him of conspiracy under 18 U.S.C. § 2, five counts of mail fraud under 18 U.S.C. § 1341, two counts of securities fraud under 15 U.S.C. § 77q(a), and one count of money laundering under 18 U.S.C. § 1957. The district court sentenced John Aptt to nine years in prison, and Douglas Murphy to just over eight years.

DISCUSSION

On appeal, Mr. Aptt and Mr. Murphy raise two common challenges to the district court's sentence. First, they argue that their fraud and money laundering counts should have been grouped together under U.S.S.G. § 3D1.2. Second, they

claim that the district court wrongly included interest due to investors in the amount of loss caused by the fraud.

In addition to these common challenges, each defendant raises individual grounds for appeal. Mr. Aptt argues that the criminal activity in this case was not extensive enough to qualify him for the four-level enhancement he received on his fraud offense for being the organizer or leader of criminal activity that involves five or more participants or is otherwise extensive. Mr. Murphy claims that his conviction should be overturned because one of the key documents showing his involvement in the criminal activity was admitted erroneously; in the alternative, he claims that his sentence should be reduced because he was not a "manager or supervisor" in that criminal activity. We conclude that none of the defendants' contentions have merit, and affirm the judgment of the trial court in all respects.

I

Because the counts of money laundering were not grouped together with the counts of fraud, Defendants' offense levels for their money laundering counts (32 for Mr. Aptt and 28 for Mr. Murphy) were each increased by two on account of the presence of another offense group of only slightly less severity. *See* U.S.S.G. § 3D1.4. Defendants contend that this failure to group, and the resulting increase in offense levels, was error. They point out that the money laundering in this case consisted solely of using the proceeds of fraud (the investors' money) to pay off

earlier investors, thus making the company's promises appear credible and furthering the fraud on later investors. Both crimes, they insist, essentially harmed the same victims (the later, unpaid investors), making grouping appropriate under U.S.S.G. § 3D1.2. The district court rejected their legal position.

We review the district court's interpretation of the Sentencing Guidelines de novo. *United States v. Torres-Aquino*, 334 F.3d 939, 940 (10th Cir. 2003). Whatever the merits of Defendants' contention from a policy perspective, their recommended approach has been repeatedly rejected in this circuit. *United States v. Johnson*, 971 F.2d 562, 576 (10th Cir. 1992); *United States v. Kunzman*, 54 F.3d 1522, 1531 (10th Cir. 1995). The rationale of those cases – which both involved Ponzi schemes like this one – is that the relevant money laundering guideline focused not on loss to any particular group but on the total volume of money laundered, and the "victim" of fraud-related money laundering was not the particular victim of the fraud, but rather "society in general." *Johnson*, 971 F.2d at 576; *Kunzman*, 54 F.3d at 1531. Because they measure different types of harm to different victims, the fraud and money laundering offenses cannot be grouped. Although other circuits have disagreed with this conclusion, we have continued to adhere to our precedent in *Kunzman*. *See United States v. Hargus*, 128 F.3d 1358, 1364 (10th Cir. 1997).

Defendants raise two arguments in a vain attempt to avoid the result of *Kunzman* and *Johnson*. First, they argue that the 2001 Sentencing Guidelines make it clear that money laundering of fraud proceeds should be grouped with the underlying fraud. That is true, but beside the point. The trial court delayed sentencing until after the 2001 Guidelines went into effect, intending to give Defendants the benefit of the new grouping rules. However, the 2001 Guidelines also revised the treatment of fraud, larceny, and other economic crimes, resulting in substantially increased offense levels for Defendants' fraud. This made sentencing under the new Guidelines decidedly less favorable to Defendants than under the old Guidelines. Therefore, to avoid an *ex post facto* problem, the trial court applied the 1995 Sentencing Guidelines in effect when the crimes were committed. *See* U.S.S.G. § 1B1.11(b)(1) (1995 & 2001). Under the so-called "one-book" rule, Defendants cannot mix and match provisions from various versions of the Guidelines in order to produce the lowest sentence; having received the benefit of the 1995 Guidelines' lighter sentences for fraud, they are stuck with 1995's unfavorable grouping rules. *See id.* § 1B1.11(b)(2) (1995 & 2001).

The one exception to this principle is that a subsequent amendment to the Guidelines can sometimes be given retroactive effect if the changes are "clarifying rather than substantive." *Id.* Given the substantial alterations in the

new money laundering guideline, which the Commission itself described as a "replacement guideline," U.S.S.G. app. C, amend. 634 at 225 (Supp. 2002), we are confident that the 2001 Guidelines do not qualify for retroactive application.

Defendants next argue that *Kunzman* and *Johnson* are distinguishable because in those cases, the defendants never intended to repay investors, instead spending investors' capital on personal expenses. Here, by contrast, Financial Instruments did ultimately invest substantial money in Costa Rica; Defendants maintain that they hoped that profits would take off, allowing them to make good on their exorbitant promises. But however good Defendants' intentions may have been, this does not affect the rationale of *Johnson* and *Kunzman*. Whether incurred maliciously or misguidedly, the type of harm measured by the fraud guideline (loss to victims) is simply not the same as that measured by the money laundering guideline (volume of laundered funds). *See Johnson*, 971 F.2d at 576.

Moreover, we are not persuaded that Defendants' purportedly good intentions bring them outside the purpose of the Sentencing Guidelines. It is true that one purpose of the fraud laws is to deter those who fraudulently obtain investor funds never intending to repay. But it is no less fraudulent when businessmen like Defendants, foolishly overconfident in their ability to deliver, encourage investors to share their overconfidence by falsely overstating their qualifications, past successes, or current business position.

Indeed, it may well be that Defendants' purportedly good intentions actually exacerbated the situation. A particularly pernicious aspect of this highly-leveraged Ponzi scheme was the way it took control of its erstwhile masters: at any given point, the consequences of stopping the scheme and defaulting, which included civil and even criminal liability, were so grim that Defendants were compelled over and over again to bet double or nothing – with each bet more hopeless than the last. Their supposed desire to make good on their promises kept them throwing good money (not rightfully theirs) after bad.

Perhaps paradoxically, the only honest route open to Mr. Aptt and Mr. Murphy at the end of 1995 was to admit that they had no source of profits and to default on their obligations to investors. Instead they chose to "clean up" Financial Instruments' old sins, by fraudulently securing new rounds of financing with which they hoped to make enough profits to pay off old and new investors alike. Had the new investors been apprised of the desperate condition of Financial Instruments and the speculative nature of its prospects in Costa Rica, we think it safe to say that most would not have hazarded their funds on Defendants' confidence that "[w]ith all of us working toward a common goal, we cannot be stopped." Trial Ex. 352 at 3. However legitimate their ultimate design, Defendants brought their conduct squarely within the plain language and the

purpose of the Guidelines when they chose to pursue that design by fraudulent means.

II

Next, Defendants dispute the amount of loss caused by their fraud. We review the district court's factual findings on this question for clear error, but "the factors a district court properly may consider [are] reviewed de novo." *United States v. Galbraith*, 20 F.3d 1054, 1058 (10th Cir. 1994). The 1995 Sentencing Guidelines provide for an enhancement of anywhere between 1 and 18 levels for fraud, depending on the amount of loss caused. *See* U.S.S.G. § 2F1.1(b)(1). Defendants each received a 15-point enhancement to their fraud offense level because the amount of loss they caused was above $10 million; they contend that they should have received a 14-level enhancement instead, because by their calculations the total loss caused was between $5 and $10 million.

The trial court accepted the government's conclusion that the total loss to investors was $11.7 million. The government arrived at that figure as follows: It took the total principal received from investors ($13.7 million), and subtracted the amount of principal voluntarily returned ($3.1 million) and the amount regained for investors in liquidation ($1.8 million). It thus calculated the total lost principal to be roughly $8.8 million. To this it added the total promised but unpaid interest ($2.9 million), to arrive at the total loss figure of $11.7 million.

-13-

Defendants first argue that the district court erred in including unpaid interest in the amount lost. This was not error. As we held in *United States v. Lowder*, 5 F.3d 467, 472 (10th Cir. 1993), when the defendant fraudulently promises a particular return on an investment, the victims of the fraud are legally entitled to the benefit of their bargain (the contracted-for interest). Thus, the proper measure of damages includes any amounts promised but unpaid.

Defendants attempt to distinguish *Lowder* by noting that they, unlike the defendant in *Lowder*, intended to repay investors. They cite *United States v. Holiusa*, 13 F.3d 1043, 1046-47 (7th Cir. 1994), in favor of their position. Once again, however, we are not convinced that the difference in intention is relevant. Under the 1995 Guidelines, when the intended loss is ascertainable *and greater than actual loss*, it is used as the amount of loss for sentencing purposes. U.S.S.G. § 2F1.1, cmt. n.7 (1995). *Holiusa* held merely that because pyramid scheme operators necessarily intend to pay back earlier investors, it is not appropriate to count gross receipts from investors as intended loss. 13 F.3d at 1047. In so holding, *Holiusa* reaffirmed the rule that "unrealized plans to repay do not reduce the loss amount" below actual losses. *Id.* at 1046.

Entirely in accordance with *Holiusa*, Mr. Aptt and Mr. Murphy have been sentenced based on the actual net losses they caused to investors, not intended loss. *Lowder*'s measure of loss is not a special measure imposed, like punitive

damages awards, because a defendant's intent or conduct was especially malicious or reprehensible. Rather, it rests on the premise that, when a particular return is promised, victims are legally entitled to it. Unpaid interest would be included among their actual losses in a breach of contract action, and there is no reason not to include such losses in fraud cases as well.

Defendants further argue that the district court should have deducted another $2.1 million in interest payments that they made, as promised, to early investors in the Ponzi scheme. However, this sum was already accounted for. The district court included only *unpaid* interest – that is, total interest promised, minus interest paid. To deduct another $2.1 million would be double counting. The district court's calculation of the loss amount is correct.[1]

---

[1]Defendants would have us calculate the total loss to investors by taking the total principal received from investors and deducting all amounts repaid to investors (both principal and interest). Besides being legally unsound, this method would have the absurd consequence that a pure Ponzi scheme (one in which all money received from later investors is paid out to earlier investors as principal or interest) would produce zero aggregate loss to investors, because losses to later investors would be offset by the high profits reaped by early investors. We note that the new 2001 "clarifying and substantive" amendments to the definition of loss specifically reject Defendants' position in favor of that taken by the district court. *See* U.S.S.G. § 2B1.1, cmt. n.3(F)(iv) (2001); U.S.S.G. app. C, amend. 617 at 181, 184-85.

## III

Mr. Aptt raises one further ground for challenging his sentence. The Sentencing Guidelines impose a four-level enhancement for being a "leader or organizer of a criminal activity that involved five or more participants or was otherwise extensive," where a "participant" is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1(a) & cmt. n.1 (1995). The district court accepted the government's position that Mr. Aptt, both Murphy brothers, and two other individuals were participants in the fraud offense, and therefore applied the four-level enhancement to Mr. Aptt's fraud count.

One of the two remaining participants was Barb Willems, the office manager for Financial Instruments who processed many of the payments to earlier investors. Although she quit after being told by Doug Murphy and her lawyer that Financial Instruments was a Ponzi scheme, she was subsequently persuaded by Mr. Aptt to return. Mr. Aptt does not contest her status as a participant. The second was David Gallegos, the manager of the Costa Rican operations. Mr. Aptt claims that the district court should not have counted David Gallegos as a "participant" for these purposes. On appeal, we review this determination for clear error. *See United States v. Cruz Camacho*, 137 F.3d 1220, 1223-24 (10th Cir. 1998).

-16-

The trial judge reached his conclusion that Mr. Gallegos was a participant based on several factors. First, he inferred that Mr. Gallegos, who held a high position in the company and had frequent conversations with Mr. Aptt and other participants, knew that the company had no source of profits with which to repay investors. Second, Mr. Gallegos, who had invested in the company, knew that investors were nevertheless being paid, putting him on notice that the company was running a Ponzi scheme. He was a criminally responsible participant, therefore, because "[w]ith knowledge that this group had no profits with which to repay investors, Mr. Gallegos continued to promote the activities of the group." Mem. of Sentencing Hr'g & Statement of Reasons, Aptt R. doc. 262, ¶ 12. Furthermore, the district court noted Mr. Gallegos's admission on cross-examination that when Mr. Aptt falsely represented to investors that "the houses [in Costa Rica] were being built in 21 days and sold very quickly," Mr. Gallegos did nothing to correct the investors' misimpression, even though he knew that in fact no units had been sold and that it had been taking more than three months to complete a building. Even if this evidence of Mr. Gallegos's involvement is consistent (barely) with his being an innocent employee attempting to generate legitimate returns for investors, it is also entirely consistent with Mr. Gallegos intentionally providing a front of apparently legitimate investment activity with which to attract more fraud victims to feed Financial Instruments' insatiable

demand for new capital. We therefore find no error, let alone clear error, in the district court's conclusion that Mr. Gallegos was a participant in the fraud scheme within the meaning of the Guidelines. Accordingly, we affirm Mr. Aptt's four-level enhancement, and need not consider the district court's argument in the alternative that the criminal activity was "otherwise extensive." *See* U.S.S.G. § 3B1.1(a) (1995).

IV

Mr. Murphy's first individual claim is that his conviction should be reversed because the key document linking him to the conspiracy, Government Exhibit 352, should not have been admitted. The document in question is an unsigned, undated memorandum to "John" from "Bruce and Doug," which was found in Financial Instruments' offices after the company had been shut down. The memorandum refers to a previous letter from Mr. Aptt hiring the authors as personal consultants, and proceeds to sketch the master plan for continuing to operate while keeping "regulators at bay." Trial Ex. 352 at 1-2. The document was a central piece of evidence in the prosecution's case; the prosecutor's closing statements focused heavily on the memo, which the prosecutor called a "smoking gun." Tr. 638-44, 678.[2] Most of it is recommendation rather than assertion, and

---

[2]Unless otherwise noted, all transcript references are to Mr. Murphy's trial transcript.

-18-

was probative not of the truth of the matter asserted, but rather of Doug Murphy's intent to keep the company alive by securing new investment with which to pay off old investors. However, Mr. Murphy argues that the document's attribution of authorship is hearsay: it is an out-of-court statement that he was an author of the document, admitted to prove the truth of the matter asserted – namely, that he was the author.

Of course, if the memo *is* the statement of Mr. Murphy, then as his own admission, it is admissible into evidence. Likewise, if it is the statement of Bruce Murphy, it is presumably admissible as the statement of a coconspirator. Thus, the central problem with the exhibit seems to be that it was not formally authenticated as the work of Doug and/or Bruce. The district court had wide latitude to consider even inadmissible evidence in determining whether to admit the memo, and presumably could have used the content of the memo as at least one factor in determining whether the memo fell under one of the exceptions to the bar on hearsay. *See Bourjaily v. United States*, 483 U.S. 171, 178-79 (1987). On the other hand, we have previously found similar names identifying authorship to be inadmissible hearsay even in the face of circumstantial evidence confirming the identity of the author. *See, e.g.*, *United States v. McIntyre*, 997 F.2d 687, 705-06 (10th Cir. 1993); *United States v. Makropoulos*, 848 F.2d 1036, 1039 (10th Cir. 1988).

Whatever the correct resolution of this legal question, however, the trial court was never given a chance to consider whether it should exclude the "smoking gun." Very early in the trial, after the prosecution had laid a foundation to admit an exhibit and moved for admission of the exhibit into evidence, Mr. Murphy's attorney responded as follows: "No objection, Your Honor. Also to speed up things, Judge, we have a stipulation. All the exhibits are stipulated to." Tr. 80. The prosecutor and the judge expressed some surprise, but proceeded with the exhibit in question. Later that afternoon, after a recess, the prosecutor said, "Your Honor, based on stipulation from opposing counsel, I would move to admit all exhibits, that is, 1 through 576, at this time." *Id.* at 93. Mr. Murphy's counsel specifically asserted that he had no objection, and the exhibits – including the "smoking gun" – were received into evidence. *Id.*

Mr. Murphy now admits that his attorney did not object to the admission of Exhibit 352, but claims that this court can still review that admission for plain error. However, admission of a stipulated exhibit is not error at all, even if it would not be admissible in the absence of such a stipulation. A defendant is free to waive objections to evidence by stipulation, perhaps "to obtain evidence on his own behalf" or in return for other concessions from the prosecution. *Diaz v. United States*, 223 U.S. 442, 451 (1912) (quoting *People v. Murray*, 17 N.W. 843, 844 (Mich. 1883)). In such contexts, admitting the stipulated evidence is so far

-20-

from being error that it would be an "impertinence" and "gross error" for a court to interfere with the stipulation. *Id* at 452; *see also United States v. Olano*, 507 U.S. 725, 733 (1993) (noting that deviation from a legal rule is not error, and hence is not reviewable, if the rule has been waived).

Perhaps recognizing how damaging this is to his position, Mr. Murphy now bravely maintains that his attorney did not actually mean to stipulate to the exhibits; instead, he was merely signaling, with "an inapt choice of words," that he had no objection to their admission. Appellant Murphy's Reply Br. 12. This self-serving reading seems inaccurate. When defense counsel said, "All the exhibits are stipulated to," he was not responding to a motion from the prosecution to admit all the exhibits, and his stipulation cannot be characterized as a failure to object. Instead, it was an active step on his part, inviting the admission of many exhibits not yet before the court at all. Later, when the exhibits were actually admitted, the prosecution made it clear that the basis for their admission was a stipulation by the parties, and defense counsel said he had no objection. Thereafter the exhibits were admitted without any foundation being laid, and indeed in one case when the prosecutor began to ask questions that might lay a foundation, the trial judge chided, "You know, this is just a waste of time. You've got all the exhibits in. Move." Tr. 134. Later in the trial, Mr. Murphy's attorney acknowledged that he had stipulated, making any arguments

-21-

about whether the government was "bootstrap[ping]" an exhibit into evidence beside the point. Tr. 323. Thus, the parties' and the court's conduct demonstrate that the stipulation was a stipulation not only in name, but also in action and effect.

Mr. Murphy claims that he is nevertheless entitled to plain-error review under *United States v. Olano*. That opinion distinguishes sharply between waiver, "the intentional relinquishment or abandonment of a known right," and forfeiture, "the failure to make the timely assertion of a right." 507 U.S. at 733. While there is no appeal from violation of a waived right, the violation of forfeited rights may be reviewed on appeal under the limited conditions set forth in *Olano*. *Id.* at 733-34. Mr. Murphy argues that he did not intentionally and in full knowledge relinquish his right to confront the "anonymous" hearsay declarant who authored the "smoking gun." Therefore, the stipulation could not be a waiver as that term is used in *Olano*, leaving Mr. Murphy eligible for plain-error review.

We think Mr. Murphy misconceives the specificity with which one must intend to waive a right under *Olano*. Certainly one need not fully comprehend all the consequences of waiving the right. We think a stipulation, which by its very nature signals the intentional relinquishment of any and all rights to challenge the admissibility of the stipulated evidence, is a clear example of waiver if anything is. *See United States v. Perez*, 116 F.3d 840, 849, 851-52 (9th Cir. 1997) (en

banc) (Kleinfeld, J., concurring).[3]

That does not end our inquiry, however, because waiver of particular rights may be governed by heightened standards: "Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and *whether the defendant's choice must be particularly informed or voluntary*, all depend on the right at stake." *Olano*, 507 U.S. at 733 (emphasis added); s*ee generally* 3 Wayne R. LaFave, Jerold H. Israel & Nancy J. King, *Criminal Procedure* § 11.6(a) (2d ed. 1999), *previous edition cited in Olano*, 507 U.S. at 733. Some rights can be waived only personally by the defendant, and only after being fully informed of his rights. *See, e.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938) (right to

---

[3]Mr. Murphy wrongly cites in his favor our recent decision in *United States v. Haney*, 318 F.3d 1161 (10th Cir. 2003) (en banc). Mr. Murphy is right that we there reviewed the trial court's failure to give a duress instruction for plain error, despite the fact that defense counsel had insisted he did not want such an instruction (except insofar as he was tried for helping a codefendant to escape rather than attempting to escape himself). *Id.* at 1166. But he elides the crucial fact that the defendant in *Haney* was tried for two separate crimes: attempted escape from prison and possession of escape paraphernalia. *Id.* at 1162-63. Defense counsel declined the duress instruction only with regard to the attempted escape, of which the defendant was ultimately acquitted. *See id.* at 1163, 1164-65. Because there was no explicit argument about whether the defendant should receive a duress instruction on the possession charge, the failure to raise that issue was properly characterized as a forfeiture reviewable under *Olano*. That failure was altogether unlike the intentional stipulation in this case.

counsel); *Brookhart v. Janis*, 384 U.S. 1, 7-8 (1966) (right to plead not guilty).[4]

But "[a]lthough there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has – and must have – full authority to manage the conduct of the trial. The adversary process could not function effectively if every tactical decision required client approval." *Taylor v. Illinois*, 484 U.S. 400, 417-18 (1988). Thus, some rights are firmly in the domain of trial strategy, and can be waived by counsel even in the face of client disagreement. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983).

The proper question, therefore, is whether and how one can waive the particular right at issue here: the right to exclude hearsay under the Confrontation Clause and the related Federal Rules of Evidence. We recently considered this question in *Hawkins v. Hannigan*, 185 F.3d 1146 (10th Cir. 1999). There, the defendant was charged with raping a 92-year-old woman. His counsel stipulated to the admissibility of "hearsay evidence pertaining to any description or identification given by the victim," because of the victim's ill health and the

---

[4]In *Brookhart*, defense counsel had agreed to a "prima facie trial," in which the government could put on evidence but the defendant could not present his own evidence nor cross-examine government witnesses. 384 U.S. at 3. While this was formally a waiver of the right to confront witnesses, the Supreme Court found that the agreement was tantamount to a guilty plea, triggering the heightened standards that apply to waiving the right to plead not guilty. *Id.* at 7. Despite the significance of the "smoking gun," there is no argument that allowing it into evidence was tantamount to pleading guilty.

potentially harmful effects of her live testimony. 185 F.3d at 1150. Defense counsel understood this evidence to include audiotapes of her interviews with the police, but counsel was apparently unaware that the stipulation would also cover a police officer's testimony that the victim had picked the defendant out of a photo lineup. *Id.*

On habeas review, this Court determined that defense counsel had validly waived his client's Confrontation Clause rights, and that the stipulation did not constitute ineffective assistance of counsel. *Id.* at 1156-57. The panel relied on three circuit court opinions for the proposition that "counsel in a criminal case may waive his client's Sixth Amendment right of confrontation by stipulating to the admission of evidence, so long as the defendant does not dissent from his attorney's decision and so long as it can be said that the attorney's decision was a legitimate trial tactic or part of a prudent trial strategy." *United States v. Stephens*, 609 F.2d 230, 232-33 (5th Cir. 1980), *quoted in Hawkins*, 185 F.3d at 1155; *see also Cruzado v. Puerto Rico*, 210 F.2d 789, 791 (1st Cir. 1954) ("Where an accused is represented by counsel, we do not see why counsel, in his presence and on his behalf, may not make an effective waiver of [the right of confrontation]."); *Wilson v. Gray*, 345 F.2d 282, 286 (9th Cir. 1965) ("[T]he accused may waive his right to cross examination and confrontation and . . . the waiver of this right may be accomplished by the accused's counsel as a matter of

trial tactics or strategy."). Here, as in *Hawkins*, there is no evidence that Defendant objected to the stipulation by counsel.

The remaining question is how to interpret the requirement that "the attorney's decision [can be said to be] a legitimate trial tactic or part of a prudent trial strategy." *Hawkins*, 185 F.3d at 1155. The cases cited in *Hawkins* focused on the issue of whether the right to confront witnesses was waivable by counsel or only by the defendant personally. Thus, their common reference to "trial tactics and strategy" were meant primarily to locate the decision to stipulate within the domain of trial strategy, where the attorney is master – not to invite subsequent tribunals to consider whether the stipulation was the wisest course of action. Elsewhere in the opinion, *Hawkins* makes this clear by saying that a waiver will be valid when done "pursuant to a *reasonable* trial strategy," *id.* n.5 (emphasis added), and we have since held that *Hawkins* is satisfied if "the attorney appear[s] to have an objectively reasonable strategy" when he or she waives Confrontation Clause rights. *Bullock v. Carver*, 297 F.3d 1036, 1058 (10th Cir. 2002).

Mr. Murphy would have us find his attorney's waiver invalid because the attorney did not specifically consider whether to pursue the hearsay objection, but rather overlooked it. We are not convinced that counsel's stipulation was so careless. Assuming that the "smoking gun" and other exhibits would have been admitted even without the stipulation, the defense's best theory was that they

-26-

exonerated Mr. Murphy by showing that he, too, had been duped by Mr. Aptt. It would be difficult to argue convincingly that the memo exonerates Mr. Murphy after strenuously objecting to its admission, and even denying that he had written it, in the presence of the jury. And even if the memo's admissibility could have been challenged without alerting the jury, it may be that defense counsel determined that the likelihood of successfully excluding the stipulated exhibits was small enough that it would be more advantageous for his client to bolster his credibility by expressing, in the presence of the jury, a willingness to let them see all of the evidence.

But even assuming that Mr. Murphy's trial counsel did overlook the potential hearsay objection, that cannot by itself justify holding his waiver invalid. If a timely objection had been made, for all we know, the government could have laid a proper foundation for admission of the memo into evidence. Defense counsel's oversight (if that is what it was) had the effect of inducing both the government and the trial judge not to bother with doing so.[5] To reverse

---

[5]The government did make an initial proffer of evidence tending to show that there was a conspiracy, which referred to the memo in an "illustrative, not exhaustive" list of the coconspirator statements it would seek to introduce once the conspiracy was established. Government's Proffer and Legal Argument Concerning Admissibility of Hearsay Decls., Murphy R. doc. 163, at 2, 3, 5. The trial judge stated, "[The memo and other exhibits attached to the government's proffer] appear to me to be authentic. And I assume if they weren't authentic, that I would have heard about it." Tr. 7-8. He then found, partly on the basis of the memo and other exhibits, that there was indeed a conspiracy. However, he

Mr. Murphy's conviction because Exhibit 352 was wrongly admitted would be to allow him singlehandedly to create below the grounds for his triumph on appeal. *See United States v. Hardwell*, 80 F.3d 1471, 1487 (10th Cir. 1996) ("A defendant cannot invite a ruling and then have it set aside on appeal.").

Mr. Murphy's position amounts to a claim that a trial counsel's waiver is deficient whenever trial counsel is not fully aware of all the possible legal arguments that could be raised in support of the intentionally abandoned position. Requiring this kind of lawyerly omniscience would make effective waivers exceedingly rare, to the detriment of defendants as well as the government. The power to waive rights is an important bargaining chip with which defendants can often gain substantial concessions from the government. But a waiver that is invalid as soon as a party thinks of a new reason for asserting the waived right is no waiver at all. *See Perez*, 116 F.3d at 852 (Kleinfeld, J., concurring). Furthermore, invalidating waivers because of mere oversights would make us into after-the-fact backseat drivers to defense counsel, constantly revisiting whether there were arguments that (in our opinion) the trial attorney should have raised.

We have no desire to assume this role, and *Hawkins* does not require us to

---

expressly reserved judgment on the admissibility of specific statements as admissions of a party opponent. Thus, at the time of the stipulation, the government had not yet had the opportunity, or the need, to authenticate the document.

do so.  To the contrary, *Hawkins* held that counsel had effectively waived the defendant's rights by stipulation *despite* the attorney's apparent confusion about the scope of that stipulation.  185 F.3d at 1150, 1155.  In determining whether the stipulation in this case was "objectively reasonable," we are bound to heed the Supreme Court's pointed warning in *Strickland v. Washington*, 466 U.S. 668, 689 (1984), against using hindsight to second-guess attorneys' tactical decisions. *Strickland* requires us to impose a heavy presumption that "counsel's conduct falls within the wide range of reasonable professional assistance; that is, . . . the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  466 U.S. at 689 (internal quotation marks omitted). Thus, under *Strickland*, we must uphold counsel's performance so long as "the challenged action *might* be considered *sound* trial strategy," *id.* (emphasis added); under *Hawkins*, we must uphold counsel's waiver "so long as it *can be said* that the attorney's decision was a *legitimate* trial tactic or part of a *prudent* trial strategy," 185 F.3d at 1155 (emphasis added).  We see no material difference between these two standards, and conclude that an attorney's stipulation to admit evidence is a valid waiver unless the defendant can show that the stipulation constituted ineffective assistance under the *Strickland* test.  *See Bullock v. Carver*, 297 F.3d at 1058 ("[B]ecause Mr. Bullock's ineffective assistance of counsel claims fail, his Confrontation Clause argument [based on hearsay to

which counsel did not object] also fails."); *Wilson*, 345 F.2d at 287 n.7 (quoting, with apparent approval, the district court's conclusion that "a reviewing court can not find a denial of the constitutional right to cross-examination merely on the basis of an error in trial tactics unless the error is so gross as to constitute a denial of adequate and effective assistance of counsel"); *cf. Murray v. Carrier*, 477 U.S. 478, 487-88 (1986) (holding in the habeas context that inadvertent or ignorant attorney error does not constitute "cause" excusing procedural default unless it rises to the level of ineffective assistance).

Because questions of counsel's effectiveness often require development of the facts not in the trial record concerning the attorney's preparation and strategy, we have held that in the typical case, they should be raised in a collateral attack under 28 U.S.C. § 2255. *United States v. Galloway*, 56 F.3d 1239, 1240-42 (10th Cir. 1995) (en banc). As Mr. Murphy acknowledges, the same is true here; the record does not show whether counsel for Mr. Murphy had carefully reviewed the stipulated exhibits, nor does it show whether he hoped to gain any strategic advantages by making the stipulation. Nothing in this record convinces us that he did not, but that is a matter best considered together with any other ineffective assistance claims Mr. Murphy might care to raise on collateral attack.

Thus, not reaching any claim of attorney ineffectiveness, we conclude that defense counsel's stipulation waived Mr. Murphy's rights and rendered the

exhibit's admission unreviewable.  As the court said in *Taylor*, 484 U.S. at 418, "[p]utting to one side the exceptional cases in which counsel is ineffective, the client must accept the consequences of the lawyer's decision to forgo cross-examination."

V

The government argued below that both Mr. Murphy's fraud and money laundering offense levels should be enhanced under U.S.S.G. § 3B1.1 because he was an organizer or leader in each respective activity, while Mr. Murphy contended that based on the facts, he should receive no enhancement at all for his role in the offense under Guideline 3B1.1  The district court took a middle position, concluding that Mr. Murphy was a "manager or supervisor of the activity."  He therefore gave Mr. Murphy a three-level enhancement on the fraud offenses under § 3B1.1(b) (because the fraud involved five or more participants), and a two-level enhancement on his money laundering offenses under § 3B1.1(c).  On appeal, Mr. Murphy argues that this was error.  We review the district court's factual findings regarding a defendant's role in the offense for clear error, and its legal determinations de novo.  *See Cruz Camacho*, 137 F.3d at 1223-24; *United States v. Baez-Acuna*, 54 F.3d 634, 638 (10th Cir. 1995).

"To qualify for an adjustment under [Guideline 3B1.1], the defendant must have been the organizer, leader, manager, or supervisor of *one or more other*

*participants*." U.S.S.G. § 3B1.1, cmt. n.2 (emphasis added). (Here, as before, a "participant" is someone who is criminally responsible for the offense. *See id.*, cmt. n.1.) In fraudulent operations like this one, the emphasized language will often be crucial, because employees who are unaware of the operation's fraudulent nature are not criminally responsible participants; as a result, managing or supervising their activities does not qualify a defendant for the enhancement.

Mr. Murphy would have us conclude that the district court overlooked this obvious point from the mere fact that the district court called Mr. Murphy a "manager or supervisor of *the activity*," instead of a manager or supervisor of other "*participants*." We do not place so much weight on the district court's turn of phrase. Indeed, another subsection of Guideline 3B1.1 itself speaks of being an "organizer, leader, manager, or supervisor *in any criminal activity*" even though it is clear under Application Note 2 of the Guideline that one can do so only by supervising or organizing one or more other participants. Thus, there is nothing inappropriate about referring to Mr. Murphy as a "manager or supervisor of the activity," so long as the district court did so on the basis of Mr. Murphy's relationship to one or more participants. The district court explained the basis of its decision as follows:

> He was a manager or supervisor because he did recruit a lawyer, he did seek the advice of lawyers, and therefore, he used the lawyers to dress up the scheme in a way which made it appear more legal.

-32-

He and his brother authored the crucial memorandum, Exhibit 352, which was the blueprint or operational plan for the conspiracy after January of 1996.

He was an officer of one of these corporations. He traveled to Panama and there hired employees, rented space and met with lawyers and bankers. That evidence is ample to demonstrate that he was a manager or supervisor in this criminal activity.

Sentencing Tr., Murphy R. vol. 9, at 20.

It is true that most of the actions cited by the district judge are not themselves clear instances of supervising another participant in the scheme. For instance, recruiting and using the lawyers does not qualify because there is no argument that any of the lawyers were criminally responsible participants. Similarly, authoring the master plan for the scheme would not qualify Mr. Murphy as a manager or supervisor if he only suggested the plan as Mr. Aptt's "personal consultant," leaving Mr. Aptt to supervise its actual implementation.

However, nothing in Guideline 3B1.1 or its application notes can be read to require direct evidence of supervision or management, which is often in short supply. In its absence, courts regularly rely on circumstantial evidence to discern the nature of the supervisory relationships among participants. For instance, in *United States v. Flores*, 149 F.3d 1272 (10th Cir. 1998), the district court applied the enhancement to a defendant solely because he was the principal supplier of a drug ring (and hence, the court inferred, able to exert substantial control over the

organization). We affirmed; even though it is clear that supplying drugs itself is not a proper basis for the enhancement, the district court's inference of control was not clearly erroneous. *Id.* at 1279. *See also United States v. Lora-Solano*, 330 F.3d 1288, 1295 (10th Cir. 2003) (upholding a manager-or-supervisor enhancement where the criminal activity was centered in the defendant's home and the defendant was heavily involved in its planning).

Indeed, Application Note 4 of the Guideline explicitly contemplates use of circumstantial evidence:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

While Application Note 4 by its terms applies only to choosing between the four-level and three-level enhancements, we have found its factors relevant in determining whether a defendant is a manager or supervisor at all. *See United States v. Green*, 175 F.3d 822, 833 (10th Cir. 1999).

Here, the memo co-authored by Mr. Murphy established that he was a principal architect of the mail-fraud and money-laundering scheme. The district

court properly cited Mr. Murphy's extensive involvement in furthering the organization's activities as circumstantial evidence of his centrality in the implementation of the scheme and his authority within the organization. Coupled with Mr. Murphy's involvement in planning and the fact that Mr. Murphy was a vice president in Financial Instruments, we think this evidence provides a reasonable factual basis for a conclusion that Mr. Murphy played a supervisory role with respect to any participants below him in the organization.

There was evidence that at least one participant, David Gallegos, was subordinate to Mr. Murphy in this way.[6] Mr. Gallegos met with both Mr. Aptt and Mr. Murphy before going to Costa Rica for the first time, and regularly sent correspondence reporting his progress to both Mr. Aptt and the Murphy brothers. Although he did not approve of Doug Murphy's proposed purchase of the Costa Rican company Prestel, Mr. Gallegos nevertheless executed the deal, and testified at trial that Mr. Murphy was above him in the Financial Instruments "pecking order." Although he later testified that, once he was in Costa Rica, he did not

---

[6]Mr. Murphy draws no distinction between participation in the mail fraud and participation in the money laundering, applying the generic term "criminal activity" to both. Given the close connection between the mail fraud and money laundering in this case, we also decline to make such a distinction – especially in the case of Mr. Gallegos, whose criminal participation in the fraud included laundering money by purchasing Prestel and engaging in other financial transactions with investors' funds, thus providing a front of business activity to cover and perpetuate the fraud.

consider Mr. Murphy a superior, the district court could reasonably resolve any conflict in his testimony to find that Mr. Murphy did indeed manage or supervise Mr. Gallegos.

More troubling is the fact that in applying the enhancement, the district judge never made specific findings that Mr. Murphy supervised David Gallegos or any other participant – lending credence to Mr. Murphy's theory that the judge had mistakenly focused on his role in managing the operations, not managing other participants. Nevertheless, given that the trial judge did cite valid circumstantial evidence for the conclusion that Mr. Murphy played a supervisory role in Financial Instruments, and given his finding that at least five people at Financial Instruments were criminally responsible participants, we think it fair to conclude that he implicitly found that as a supervisor second only to Mr. Aptt and perhaps Bruce Murphy, Mr. Murphy supervised any and all participants below him in the Financial Instruments chain of command (including Mr. Gallegos). The Guideline requires only a conclusion that Mr. Murphy supervised at least one such participant; it does not require the court to identify specific examples. Accordingly, we conclude that the Court applied the correct legal standard, and that its factual determinations under that standard were not clearly erroneous. Hence, we affirm both the three-level enhancement to Mr. Murphy's fraud offense and the two-level enhancement to his money laundering offense.

Finally, even were we to accept Mr. Murphy's contention that the district court committed legal error, Mr. Murphy could not prevail. Because he did not raise his legal argument below, any such legal error would be eligible only for plain error review under Rule 52(b) of the Federal Rules of Criminal Procedure. *See Olano*, 507 U.S. at 732. Had Mr. Murphy timely objected to the alleged flaw in the district court's reasoning, the district court easily could have named specific participants in the fraud and money laundering that Mr. Murphy supervised, or it could have made an equivalent departure based on Mr. Murphy's "management responsibility over the property, assets, or activities of a criminal organization." U.S.S.G. § 3B1.1, cmt. n.2. Any legal error was therefore unlikely to prejudice Mr. Murphy, and certainly did not "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *United States v. Atkinson*, 297 U.S. 157, 160 (1936), *quoted in Olano*, 507 U.S. at 736. Thus, even if there were an error and we had discretion to correct it, we would decline to do so.

CONCLUSION

For the foregoing reasons, Mr. Murphy's conviction and both Defendants' sentences are **AFFIRMED**.