**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 30, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff-Appellee.

v.

JASON MITCHELL ABBO,

        Defendant-Appellant.

No. 12-6240
(D.C. No. 5:11-CR-00385-M-1 )
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **O'BRIEN**, and **GORSUCH**, Circuit Judges.

Jason Abbo was convicted of being a felon in possession of a firearm.  We are

asked to decide whether the trial judge violated his Sixth Amendment right to

confrontation by limiting his cross-examination of a government witness and whether his

stipulation to proposed testimony about his prior convictions precludes him from now

---

[*] The parties have waived oral argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R.
34.1(G).  This case is submitted for decision on the briefs.

This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A).  Citation to unpublished decisions is not prohibited.  Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value.  10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished).  *Id.*

challenging their authenticity. Both of Abbo's arguments are plagued by an overarching issue: whether on appeal a defendant may be permitted to argue matters not adequately presented in the district court where the claimed errors could have been easily corrected. Longstanding and often repeated precedent condemns the practice. We affirm.

## I. FACTUAL BACKGROUND

We recite the facts in the light most favorable to the jury's verdict. *See United States v. Pablo*, 696 F.3d 1280, 1284 n.5 (10th Cir. 2012). On November 9, 2011, Tiffany Olandese met Abbo at his mother's residence in Oklahoma City, Oklahoma. At about 8 or 9 p.m., Olandese drove Abbo in her vehicle to Wal-Mart where Abbo purchased ammunition. On the way back to Abbo's mother's house, Olandese saw Abbo holding a gun.[1] Several hours later (now the early morning hours of November 10), they again left Abbo's mother's house in Olandese's vehicle to go to a friend's house. The friend was not home so Abbo told Olandese to drive to the south side of the City.

Oklahoma City Police Officer Timothy Campbell observed Olandese's vehicle swerve over the center line. He also noticed the light illuminating the car's license plate was insufficient under Oklahoma law. *See* Okla. Stat. Ann. tit. 47, § 12-204.1. Campbell decided to stop the vehicle and activated his lights. When Olandese saw the lights, she told Abbo they were being pulled over. In response, Abbo told Olandese he was putting "this" under the front passenger seat. (R. Vol. 4 at 92.) When she asked what it was,

---

[1] Olandese testified she had seen Abbo with the same gun a few weeks before.

Abbo did not directly answer, but instructed her to tell the police it was hers because she had a concealed carry permit.

Campbell approached the vehicle. He told Olandese why he had pulled her over and asked her routine questions concerning her travels. She and Abbo were "extremely nervous." (R. Vol. 4 at 35.) When Campbell asked questions Olandese would not look at him and Abbo tried to answer for her. Campbell obtained driver's licenses from Olandese and Abbo. A license check revealed not only Abbo's previous felony conviction, but also an outstanding warrant for his arrest. Campbell called for backup.

Once backup arrived, Campbell took Abbo into custody. He then questioned Olandese. She was still nervous and now visibly shaking. He asked her if there was anything illegal in her vehicle. She hesitated and said: "Uhm, I don't think so." (R. Vol. 4 at 37.) She then consented to the search of her vehicle. Before searching, Campbell asked Olandese to leave her vehicle. As Olandese was stepping out of the vehicle she said "Oh, well, my gun is in here . . . . But I have a concealed carry [permit]."[2] (R. Vol. 4 at 38.) When Campbell asked her where the gun was, she responded "Well, it is under his seat . . . . I mean the passenger seat." (R. Vol. 4 at 39.)

Campbell found a Smith and Wesson .40 caliber handgun on the floorboard under the front passenger seat where Abbo had been sitting. The gun was loaded with a

---

[2] Campbell found this behavior suspicious because in his previous dealings with those holding a concealed carry permit, they are quick to comply with Oklahoma law which requires such individuals who come in contact with law enforcement personnel to immediately inform the officer(s) of the permit and weapon. *See* Okla. Stat Ann. tit. 21, § 1290.8 (C).

magazine but no round was in the chamber. A single cartridge was found in the center console; it was of the same caliber and manufacturer as the bullets in the gun.

After retrieving the gun, Campbell asked Olandese what kind of gun it was. She said she did not know, "[a] .45?" (R. Vol. 4 at 96.) Believing she was lying about owning the gun, Campbell told her if it was her gun, she could be sent to jail for assisting a felon (Abbo) in possessing a firearm. She then admitted it was not her gun but Abbo's.

Abbo agreed to talk to Campbell. He claimed he had no knowledge of the gun and said "I don't know what it matters, she has a concealed carry [permit] anyways." (R. Vol. 4 at 48.) Campbell transported Abbo to the county jail, where he was searched. During the search, a gun holster fell from his pants leg when he took off a shoe. The holster contained a place to hold a magazine. Abbo admitted the holster was his but claimed "it [didn't] fit that gun you found, I found [the holster] earlier, somewhere else." (R. Vol. 4 at 52.) In fact, the gun and magazine fit perfectly in the holster.

Abbo was indicted with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He was convicted by a jury and sentenced as an armed career criminal under 18 U.S.C. § 924(e) to 180 months imprisonment, the statutory minimum.

## II. DISCUSSION

A.    Sixth Amendment Right to Confrontation

Prior to trial, the government orally moved to (1) prohibit Abbo from introducing evidence concerning Olandese's prior drug use to attack her credibility and (2) preclude a jury instruction concerning how to judge the credibility of a drug user. Abbo objected, claiming Olandese's drug use was fair game to impeach her credibility. The judge

- 4 -

decided the jury instruction was proper and Abbo could question Olandese concerning her drug use but only as to the extent it may have affected her ability to perceive the underlying events and to testify lucidly at trial.[3]

Abbo questioned Olandese about her prior drug use and her drug use on the day of the incident. This questioning revealed Olandese and Abbo to be addicted to painkillers. They bought drugs and used them together. On the day of the incident, Olandese took Oxymorphone, a painkiller.[4] She did not have a prescription for it so she purchased it illegally from others. She did have a prescription for two other painkillers, Lortab and Subutex. She took two Lortabs and a half tablet of Subutex each day.[5] At the time of the incident, she had been addicted to painkillers for about a year.

Abbo claims Olandese's credibility was crucial to the case and the judge infringed his Sixth Amendment right of confrontation by limiting his ability to cross-examine her—the government's star witness—on her drug addiction. He points to Olandese's changed story, first saying she owned the gun but later saying it was Abbo's. He claims he should have been allowed to fully explore the dishonest nature of drug addicts in

---

[3] The jury was instructed:

> The testimony of a drug abuser must be examined and weighed by the jury with greater caution than the testimony of a witness who does not abuse drugs. You must determine whether the testimony of that witness has been affected by the use of drugs or the need for drugs.

(R. Vol. 1 at 40.)

[4] Olandese did not indicate the amount of Oxymorphone she took on the day of the incident.

[5] It is not clear whether she also took these pills on the day of the incident (in addition to the Oxymorphone).

- 5 -

general and Olandese in particular. Had he been able to do so, he argues, he would have solicited from Olandese an admission of obtaining painkillers with forged prescriptions, making her a liar.

The Sixth Amendment gives a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. A primary interest secured by the right of confrontation is the right to cross-examine adverse witnesses. *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974). "The opportunity for cross-examination . . . is critical for ensuring the integrity of the fact-finding process [because] [c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Kentucky v. Stincer*, 482 U.S. 730, 736 (1987) (quotations omitted).

The right to cross-examination, however, is "not absolute or unlimited." *Miranda v. Cooper*, 967 F.2d 392, 401 (10th Cir. 1992). While the Sixth Amendment's Confrontation Clause "guarantees an *opportunity* for effective cross-examination, [it does not guarantee] cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). A trial court "retain[s] wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). The defendant bears the burden of establishing he was "prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and

thereby to expose the jury to the facts from which jurors could appropriately draw inferences to the reliability of the witness." *Id.* at 680 (quotations omitted).

Evidence of a witness's drug use is ripe for cross-examination. It bears directly on the witness's ability to perceive or recall events or testify accurately. *United States v. Robinson*, 583 F.3d 1265, 1272, 1274-75 (10th Cir. 2009); *United States v. Apperson*, 441 F.3d 1162, 1195-96 (10th Cir. 2006). To that end, the judge allowed Abbo to cross-examine Olandese about her prior drug use and the extent to which it affected her cognitive ability and her ability to testify cogently at trial. And Abbo took full advantage, questioning her about her addiction to painkillers and her use of drugs on the day of his arrest. Indeed, Abbo does not appear to claim error on this basis.

Instead, he claims the limitations the district court placed on his cross-examination of Olandese precluded him from showing she was a liar. In his brief to this Court, Abbo sets forth a hypothetical colloquy between defense counsel and Olandese in which counsel gets Olandese to admit (1) she frequently forged prescriptions to obtain painkillers, (2) a person who forges prescriptions must be a liar, and (3) because she is a liar, she must have lied to the police about the gun's ownership. While the conclusion does not necessarily follow the premise, such questioning might have been proper credibility evidence had the offer and argument been made to the district judge. *See* Fed. R. Evid. 608(b) (a court may allow, on cross-examination, inquiry into specific instances of a witness's conduct to attack the witness's character for truthfulness or untruthfulness); *United States v. DeSoto*, 950 F.2d 626, 629 (10th Cir. 1991) ("Defense counsel should ordinarily be given wide latitude when cross-examining a witness about credibility or

- 7 -

bias."). But the hypothetical questioning contained in Abbo's brief is just that—hypothetical. He never attempted to question Olandese about her having forged prescriptions in the past nor did he provide the court with an offer of proof regarding her probable answers to such questioning, had it been permitted. It is not clear such questioning would have been prohibited by the court if a clear and proper request had been made; after all, Abbo was allowed to elicit Olandese's admission to having Oxymorphone without a prescription—a tacit admission to having illegally obtained it. Because Abbo failed to preserve the issue in the district court, our review is for plain error.[6] *See United States v. Perez*, 989 F.2d 1574, 1582 (10th Cir. 1993) (en banc) ("[W]here a Confrontation Clause objection is not explicitly made below we will not address the constitutional issue in the absence of a conclusion that it was plain error for the district court to fail to raise the constitutional issue *sua sponte*."). "To constitute plain error under the Confrontation Clause, the *constitutional* error must be (1) obvious, and (2) affect substantial rights." *Id.* at 1583 (quotations omitted).

Assuming there was error, Abbo has failed to show it affected his substantial rights, i.e., "a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *Pablo*, 696 F.3d at 1293 (quotations omitted). That is because Abbo used other avenues to attack Olandese's credibility including:

---

[6] If it was ever Abbo's intent to ask Olandese questions going to her truthfulness in general, he never made it clear to the trial judge. The record suggests his attacks related to Olandese's ability to have accurately observed the events, to recall and relate them for the jury, and derivatively, even if ironically, to paint her as a drug-seeking addict (a bad person) unworthy of belief for that reason alone.

pointing out her changed story about the gun's ownership after Thompson threatened her with prosecution as an accomplice; her illegal purchase of Oxymorphone; her failure to inform the investigating agent about seeing the same gun two weeks before the incident (a fact she did not mention until she was before the grand jury); and her failure to immediately tell the prosecutors about Abbo's purchase of ammunition at Wal-Mart when she was recalling a trip she and Abbo made to the store. In light of these other attacks, we see no reason to believe further attack would have made any difference on the jury's verdict, especially since the other evidence of guilt, to wit, the gun was found under the seat where Abbo had been sitting, a holster perfectly fitting the gun and its ammunition was found on Abbo's person, Abbo had two previous convictions for possessing a firearm (which we conclude, *infra*, were properly admitted by stipulation) and the statements Abbo made to Thompson at the scene and at the police station after the holster was found were intentionally self-serving but, at the same time, more than a little incriminating.

B.    Stipulation to Rule 404(b) Evidence

Prior to trial, the government provided notice of its intent to introduce other crimes, wrongs and acts evidence under Rule 404(b) of the Federal Rules of Evidence, namely, Abbo's two previous convictions for possessing a firearm. It claimed these prior convictions were relevant to showing his knowing possession of the gun found in the vehicle. Abbo objected. He claimed the probative value of the convictions was substantially outweighed by unfair prejudice and they were not being offered for any purpose other than an improper one—to show Abbo's propensity to possess firearms.

The judge determined the evidence would be prejudicial but not unfairly so and allowed its admission.

At trial, the Rule 404(b) evidence came in via stipulation:

The Defendant, Jason Mitchell Abbo, his attorney . . . and the United States . . . stipulate to the following testimony: If called to testify, David Pennington, agent with Alcohol, Tobacco, Firearms and Explosives would testify that he reviewed official Oklahoma County District Court documents identifying the following convictions of Jason Mitchell Abbo: First, that on December 5, 2006, Jason Mitchell Abbo was convicted in Oklahoma County District Court case CF-05-5204 for possessing a firearm after a previous juvenile adjudication on June 21, 2004; second, that on December 5, 2006, Jason Mitchell Abbo was convicted in Oklahoma County District Court case CF-04-5709 for possessing a firearm after previous conviction on October 8, 2004. The jury may take the stipulation as if David Pennington, with ATF, has testified to these facts at trial. It is agreed to and accepted this the 23rd day of April 2012, signed by [the government, defense counsel,] and the Defendant Jason Mitchell Abbo.

(R. Vol. 4 at 134-35.)

Abbo's argument to the trial judge—that the evidence of his prior convictions was not admissible under Rule 404(b)—has changed on appeal. He now claims the judge abused her discretion in admitting the evidence of his convictions because the substantiating documents were unauthenticated:
Agent Pennington was not the custodian of the county court's records. He claims the stipulation to the admission of Pennington's expected testimony did not constitute a stipulation to the authenticity of the prior convictions.

He relies on *United States v. Spann*, where we said "a stipulation as to the testimony a witness would give if called, although it may constitute evidence of the facts covered, is not an admission of the truth of such testimony and does not prevent a party from attacking it as he might attack the testimony itself, had it been given." 515 F.2d

579, 583 (10th Cir. 1975).  But, like the defendant in *Spann*, Abbo never attempted to attack the proposed testimony of Agent Pennington concerning the authenticity of his convictions.  *Id.*  Thus, his argument comes "too late."  *Id.*

In any event, by entering into the stipulation, Abbo waived any right to challenge the admissibility of the evidence on foundational grounds.  *See United States v. Aptt*, 354 F.3d 1269, 1281 (10th Cir. 2004) ("[A] stipulation, which by its very nature signals the intentional relinquishment of any and all rights to challenge the admissibility of the stipulated evidence, is a clear example of waiver" to which there is no right to appeal.); *see also United States v. Lepanto*, 817 F.2d 1463, 1466 n.3 (10th Cir. 1987) (because defendant stipulated to admission of the evidence, he waived any challenge to its authenticity); *United States v. Tran*, 57 F.3d 1081, No. 94-6129, 1995 WL 316152, at *3 (10th Cir. May 12, 1995) (unpublished) ("Since Defendant stipulated to the admissibility of the telephone toll records as business records, the government was not required to introduce evidence authenticating the telephone toll records.").[7]

An appeal is not a mechanism for bringing new claims, and for good reason.  Had Abbo timely objected, the government could have offered, as it was ready to do, certified copies of Abbo's prior convictions.  The certified documents would have been self-authenticating under Rule 902(4) of the Federal Rules of Evidence.  But Abbo's stipulation "had the effect of inducing . . . the government . . . not to bother with doing so."  *See Aptt*, 354 F.3d at 1283.  To reverse Abbo's conviction because his prior

---

[7] Unpublished opinions are not binding precedent.  10th Cir. R. 32.1(A).  We mention *Tran* only because of its persuasive and reasoned analysis.

- 11 -

convictions were wrongly admitted by stipulation would improperly "allow him singlehandedly to create below the grounds for his triumph on appeal." *Id.*

**AFFIRMED.**

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge