**PUBLISH**

**December 10, 2009**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff–Appellee,

v.

JOSEPH MASEK,

      Defendant–Appellant.

No. 08-1296

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 07-CR-248-WYD)**

---

Thomas P. Sleisenger, Law Offices of Thomas P. Sleisenger, Los Angeles, California for the Defendant–Appellant.

John M. Hutchins (David M. Gaouette and Robert Mydans with him on the briefs), Office of the United States Attorney, Denver, Colorado for the Plaintiff–Appellee.

---

Before **TACHA**, **BALDOCK**, and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

      Joseph Masek appeals his sentence of thirty-three months' imprisonment and his

restitution order following a conviction for wire fraud. Masek created fraudulent accounts in order to collect commissions and other payments from Echostar Satellite LLC ("Echostar"). We conclude that the district court did not commit clear error in calculating the loss for sentencing purposes or in determining the restitution owed to Echostar. We further hold that Masek's sentence was both procedurally and substantively reasonable. Exercising jurisdiction under 18 U.S.C. § 742, we affirm.

**I**

Masek and his wife owned and operated Satellites and More, a retailer for Echostar. Under a written retailer contract, Satellites and More marketed and sold Echostar television programming services. Satellites and More also purchased Echostar equipment—typically satellite dishes, receiver boxes, and programming cards—from regional Echostar distribution centers and resold the equipment to individual customers. When Satellites and More signed up a new Echostar customer or opened a new account, it received two payments from Echostar: (1) a reimbursement for the equipment; and (2) an incentive payment, or commission. The average amount paid to a retailer per account is approximately $400 and is based on a two-tier system. The first-tier commission is paid if a customer account remains open for ninety days, and the second-tier requires 360 days.

In 2005, Bruce Warner, Echostar's general manager of risk and audit retail services, learned about seventy-nine suspicious accounts related to Satellites and More. Each account was registered in Tulsa, Oklahoma—even though Satellites and More was

located in California—and each account featured an inexpensive receiver and programming package, included no customer contact information, and was set up so that statements would not be mailed to a physical address. This discovery led Warner to investigate the 9067 accounts opened by Satellites and More. Of this total, Warner identified 4310 he believed to be fraudulent; that is, accounts for which no actual customer had ordered programming. Warner turned off service for these accounts but only sixteen customers called to complain, leading Echostar to conclude that Satellites and More had opened 4294 fraudulent accounts. Many of the fraudulent accounts were opened using pre-paid debit cards set to make automatic payments with limited funds. Most of these accounts were opened in states where Echostar offered promotions that featured little or no payments in the first ninety days of service, allowing Satellites and More to collect a commission before the account became delinquent.

Warner contacted the FBI, which interviewed Masek in the presence of his attorney. Masek admitted creating numerous fraudulent accounts and collecting commissions and other payments associated with those accounts. He was charged with one count of wire fraud in violation of 18 U.S.C. § 1343. Masek pled guilty pursuant to a written plea agreement. In the plea agreement, the government estimated the total loss attributable to the charged crime at $2.5 million, but Masek reserved his right to challenge the government's loss calculations.

Echostar filed a civil complaint against Masek, and the parties settled prior to Masek's sentencing. Masek agreed to pay Echostar $1.24 million, including $150,828.03

in attorneys' fees. The parties mutually released each other from "any and all claims . . . whatsoever . . . in law or in equity . . . relating in any manner to any and all causes of action  . . . that may be prosecuted."

At the sentencing hearing, the government introduced testimony from Warner, who had examined each of the fraudulent accounts and determined that Echostar had paid Satellites and More a total of $2,453,793 for those accounts. Warner stated that this number credited Masek for "chargebacks," which are withdrawals of commissions and incentives taken by Echostar from Satellites and More because customers cancelled service prematurely. The figure did not credit Masek for payments made on the fraudulent accounts from pre-paid debit cards. However, Warner testified that the total amount paid into the 4294 fraudulent accounts was $290,757.80.

The government also presented Curtis Maleri, a special agent with the FBI who acted as the case agent for the Satellites and More investigation. Maleri reviewed audit information compiled by Warner and his staff and created consolidated transaction worksheets detailing the fraud. Maleri calculated a "very, very, very conservative[]" total loss figure of $2,043,658.25 by adding up the payments Echostar made to Satellites and More, then deducting "chargebacks" later recouped by Echostar. Maleri's figure differed from Warner's because Maleri excluded any Satellites and More accounts registered in California on the theory that such accounts could have been legitimate.

Masek testified on his own behalf. He argued that the loss figure should be lowered for a variety of reasons. Masek claimed:  (1) that Warner substantially

-4-

underreported the amount paid on the fraudulent accounts, with the correct figure totaling over $1 million; (2) Echostar improperly charged back $23,299.75 from Satellites and More; (3) Echostar included legitimate accounts in the list of 4294, inflating the loss figure by $481,284.50; (4) Echostar failed to credit Satellites and More $198,113.00 for equipment returned to Echostar; (5) Satellites and More ordered and paid for $38,766.00 worth of equipment that Echostar never delivered; and (6) Echostar seized more than $100,000 from Satellites and More accounts. Based on Masek's calculations, the total loss amount was only $88,763.91.

The district court found that Warner and Maleri testified credibly, and that Masek did not. It adopted a loss amount of $1,752,901.25, representing Maleri's figure of $2,043,658.25 less the debit card payments of $290,757. With a total offense level of 20 and a criminal history category of I, Masek's advisory Guidelines range was thirty-three to forty-one months. The court denied Masek's motion for a downward departure, ruling that the 18 U.S.C. § 3553(a) factors counseled in favor of a thirty-three month sentence. In determining the restitution amount, however, the court subtracted the non-attorney fee portion of Masek's settlement payment from the total loss figure and ordered restitution of $663,729.28 under the Mandatory Victims Restitution Act ("MVRA"). Masek now appeals his sentence and the restitution order.

**II**

Masek's primary contention is that the district court erred in calculating the loss amount for both sentencing and restitution purposes. We review a district court's legal

-5-

sentencing determinations de novo and its factual findings for clear error. United States v. Gallant, 537 F.3d 1202, 1234 (10th Cir. 2008). These same standards of review apply to an order of restitution under the MVRA; however, the amount of restitution is reviewed for abuse of discretion. Id.

In fraud cases, the Guidelines allow district courts to use either the actual or the intended loss to establish a defendant's offense level. U.S.S.G. § 2B1.1 n.3; see also United States v. Messner, 107 F.3d 1448, 1455 (10th Cir. 1997). Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 n.3(A)(i). Intended loss means "the pecuniary harm that was intended to result from the offense." U.S.S.G. § 2B1.1 n.3(A)(ii)(I). "The court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 n.3(C).

For MVRA purposes, the court must use actual loss as its metric. Gallant, 537 F.3d at 1247. "[I]n the case of fraud or theft, the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the information available." Id. at 1252 (quotation omitted). The government bears the burden of proving the amount of loss by a preponderance of the evidence. Id. at 1247.

## A

Masek filed a response to his pre-sentence report challenging Echostar's loss figures on ten specific grounds, and these challenges inform much of his appeal. His first four alleged defects relate to payments he claims to have made on the fraudulent accounts (via four different payment systems). Masek asserts that "the government has not

-6-

rebutted evidence contained in" his exhibits "and there is no suggestion Masek has either misrepresented or concealed information." Masek is incorrect on both counts.

At the sentencing hearing, Masek testified that he purchased prepaid debit cards and used them to make sufficient payments on the fraudulent accounts so that they would remain open long enough for him to collect commissions. He introduced four exhibits showing more than $1 million in prepaid card purchases and $66,036.85 in direct transfers, and claimed that all of those funds went to Echostar. However, as the district court noted, the documents show only that Masek purchased debit cards—they do not demonstrate that the cards were actually used to pay Echostar.[1] Masek claimed that he had evidence tying the cards to the fraudulent accounts, but was unable to gather such documents and present them to the court. The district court specifically rejected Masek's version of events as not credible. Instead, it relied on Warner's testimony that he examined each of the 4294 fraudulent accounts and found total payments on those accounts of $290,757.80. Masek provides no basis to reject the district court's factual findings on this issue. See Wessel v. City of Albuquerque, 463 F.3d 1138, 1145 (10th Cir. 2006) ("We give the district court's determinations regarding the credibility of witnesses great deference." (quotation omitted)).

Masek also argues that he should be credited for a variety of "legitimately earned

---

[1] One exhibit, showing "precash payments," contains bank statements with highlighted transfers. However, the document does not indicate that Echostar received these transfers. Further, the precash payments total substantially less than the amount for which Masek was credited and thus may represent a portion of that credit.

commissions" and other "subcategories of offsets, debits, and chargebacks" discussed in his defense exhibits. Most of these asserted credits related to legitimate business dealings between Echostar and Satellites and More. Masek contends he was improperly "charged-back" $23,299.75 and that Echostar froze $180,000 in payments the company owed him. Masek also seeks credit for approximately $200,000 worth of receivers that were allegedly returned to Echostar but for which Satellites and More received neither payment nor replacements. Warner testified that these receivers were not related to the fraudulent accounts and that no money was owed on these receivers in any event. Finally, Masek seeks credit for equipment he ordered from Echostar that he claims was never delivered.

Masek advances these claims as if the purpose of the sentencing hearing were to conduct a final accounting between Echostar and Satellites and More. This assumption is incorrect; the purpose of the hearing was to determine the amount of loss resulting from the charged offense. See U.S.S.G. § 2B1.1 n.3. Regardless of whether Echostar owes Satellites and More for separate, legitimate business transactions, such a debt would not affect the loss calculation.[2]

The only other issue Masek's exhibits identify is an alleged "discrepancy" in the government's tabulation of the total payments between Echostar and Satellites and More. In his testimony at the sentencing hearing, Masek claimed that this discrepancy occurred

_____

[2] Further, Masek appears to have waived such claims for payment in his settlement agreement with Echostar.

because the government added "chargebacks" to the payment total rather than subtracting them—an argument he repeats before this court. However, in his response to the presentence report, Masek instead argued that the discrepancy was caused by Echostar including legitimate accounts in its figures. Masek's exhibit purporting to reflect this discrepancy does not support either theory; rather, it is an account-by-account listing of the amounts reflected in the government's documents, and the difference between the government's totals and Masek's. These differences do not appear to correspond to chargeback amounts. The alleged "discrepancy" then, is simply a disagreement regarding the amount Echostar paid to Satellites and More. Such a disagreement does not establish that the district court clearly erred. It was free to credit the government's figures over Masek's. See Gallant, 537 F.3d at 1234 (district court's factual findings reviewed for clear error).

In Masek's final evidentiary challenge, he argues that the district court should not have relied on the government's witnesses and exhibits because they lacked "sufficient indicia of reliability." The government introduced two witnesses who oversaw a review of every fraudulent account. Those witnesses tabulated the total amount paid to Satellites and More, as well as the total paid to Echostar on those accounts. In adopting the most conservative figures advanced by the government in determining the amount of loss and restitution, the district court acted consistently with its obligation to arrive at a "reasonable estimate" of each. Id. at 1237, 1252; U.S.S.G. § 2B1.1 n.3(C). Masek has not presented evidence to bring the reliability of these witnesses' conservative estimates

or the court's findings into doubt, let alone establish clear error.

## B

In addition to his evidentiary arguments, Masek asserts that the settlement amount should be credited against the loss figure for the purposes of calculating his Guidelines range. We reject this contention. The Guidelines note that "money returned" should be credited against the actual loss, but only if such funds are returned "before the offense was detected." U.S.S.G. § 2B1.1 n.3(E)(i). Because the settlement in this case occurred after Masek's scheme was discovered, he cannot seek a more lenient sentence because he was forced to repay his victim under the threat of civil liability. See United States v. Pappert, 112 F.3d 1073, 1079 (10th Cir. 1997) ("We do not allow defendants to barter prison time in exchange for restitution."). Masek's "repentance is not so much regret for the ill [he] ha[s] done as fear of the ill that may happen to [him] in consequence." Francois duc de La Rochefoucauld, Reflections or Sentences & Moral Maxims 41 (J.W. Willis Bund & J. Hain Friswell trans., Kessinger Pub. 2005) (1871).

Masek also suggests that the amount of the civil settlement should cap the amount of loss for both Guidelines and MVRA purposes. He cites United States v. Gallegos, 975 F.2d 710 (10th Cir. 1992), in which we noted it "would be incongruous to hold that the actual loss to the bank was greater than the amount the bank now seeks to collect" after reaching a settlement agreement with a defendant convicted of making a false statement on a loan application. Id. at 711, 713. However, we never addressed the validity of the court's loss calculation, instead remanding for the court to clarify whether it based its

order on actual or intended loss. Id. at 713. We have twice rejected attempts to read Gallegos' dictum as binding precedent. See United States v. Waldroop, 431 F.3d 736, 744 & n.1 (10th Cir. 2005) ("The district court properly excluded [defendant's] settlement with [the victim] when calculating the actual loss caused by his fraud."); Pappert, 112 F.3d at 1079 n.2.

Moreover, the facts of Gallegos are far different from those here. In Gallegos, the victim bank had obtained some recovery from third parties and had "reduced its claim against Mr. Gallegos to the amount of the settlement agreement." 975 F.2d at 712-13. By contrast, the settlement agreement in this case specifically notes that the parties "acknowledge that there is a disagreement regarding the amount of actual damages," but "desire to resolve any and all disputes pending between them by way of compromise rather than by further litigation." Echostar may have settled with Masek for any number of reasons. It may have sought to avoid the costs of trial, or it may have estimated that Masek would be judgment proof beyond the settlement amount. Nothing in the record suggests Echostar "reduced its claim" to the settlement total.

Masek also argues that the settlement agreement forecloses the possibility of a restitution award. Again, we disagree. In Gallant, we held that a civil "settlement does not bar restitution" under the MVRA. 537 F.3d at 1251. Masek asserts that by referring to claims "in law or in equity . . . that may be prosecuted," his settlement agreement escapes the reach of Gallant, but the government correctly notes that Echostar cannot waive the government's rights: The United States was not a party to the settlement

-11-

agreement.  See id. ("The MVRA requires the sentencing court to provide restitution to victims.  A private settlement cannot abrogate that language.").[3]

## III

Masek further claims that his sentence was both substantively and procedurally unreasonable, and that the court abused its discretion in refusing to grant a downward departure for extraordinary acceptance of responsibility.  We review criminal sentences for reasonableness.  See Rita v. United States, 551 U.S. 338, 340 (2007).  Reasonableness includes both procedural and substantive components.  United States v. Sutton, 520 F.3d 1259, 1262 (10th Cir. 2008).  The procedural component focuses on the manner in which the sentence was calculated, and the "substantive component concern[s] the length of the sentence actually imposed."  Id.  When the district court correctly calculates a Guidelines range based on factual findings that are not clearly erroneous and imposes a sentence within that range, the sentence is entitled to a presumption of reasonableness on appeal. Id.; see Rita, 551 U.S. at 347.  We defer to the district court's weighing of the 18 U.S.C. § 3553(a) factors.  United States v. Smart, 518 F.3d 800, 808 (10th Cir. 2008).

In imposing Masek's sentence, the district court stated:  "After carefully considering the advisory Guidelines and the sentencing factors found at [§] 3553(a), the [c]ourt concludes that imposing a sentence within the advisory Guidelines range is a just

---

[3] Gallant requires that a civil settlement be credited against a restitution award, as the district court did here.  See id. ("[W]hen determining the amount of a restitution award under the MVRA, the court must reduce restitution by any amount the victim received as part of a civil settlement." (quotation omitted)).

and appropriate sentence in this case." Our review of the record on appeal demonstrates that the district court did not commit procedural error, but carefully considered the relevant statutory factors. "Magic words" are unnecessary. See United States v. Rodriguez-Quintanilla, 442 F.3d 1254, 1258-59 (10th Cir. 2006).

With respect to substantive reasonableness, Masek cites two cases in which a district court opted to depart downward in fraud cases, United States v. Thurston, 544 F.3d 22 (1st Cir. 2008), and United States v. Ruff, 535 F.3d 999 (9th Cir. 2008), but does not explain how those cases lead to the conclusion that the district court here abused its discretion. Indeed, Masek appears to have obtained a relatively light sentence in view of his properly calculated Guidelines range, the length of his fraudulent scheme, and the amount of loss he caused.

As to Masek's final claim, we held in United States v. Chavez-Diaz, 444 F.3d 1223 (10th Cir. 2006), that "we do not have jurisdiction to review the district court's discretionary decision to deny a downward departure," but may only "review the sentence imposed for reasonableness." Id. at 1229. Having concluded Masek's sentence was reasonable, we may not rule that the district court abused its discretion in denying a downward departure.

**IV**

For the foregoing reasons, Masek's sentence and restitution order are **AFFIRMED**.

-13-