FILED
United States Court of Appeals
Tenth Circuit

February 7, 2017

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

JAMES DOUGLAS PIELSTICKER,

     Defendant - Appellant.

No. 15-5105
(D.C. No. 4:14-CR-00153-GKF-1)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BALDOCK** and **PHILLIPS**, Circuit Judges.[**]
_____

James Douglas Pielsticker was the president and chief executive officer

("CEO") of Arrow Trucking Company ("Arrow"), a freight-hauling service. In

response to a Superseding Information, Pielsticker pleaded guilty to both its counts.

_____

  [*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. But it may be cited for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

  [**] The Honorable Neil Gorsuch heard oral argument but did not participate in the
order and judgment. The practice of this court permits the remaining two panel judges, if
in agreement, to act as a quorum in resolving the appeal. *See* 28 U.S.C. § 46(d); *see also
United States v. Wiles*, 106 F.3d 1516, n* (10th Cir. 1997) (noting this court allows
remaining panel judges to act as a quorum to resolve an appeal); *Murray v. National
Broadcasting Co.*, 35 F.3d 45, 48 (2d Cir. 1994), *cert. denied*, 513 U.S. 1082 (1995)
(remaining two judges of original three judge panel may decide petition for rehearing
without third judge).

Count 1 charged that Pielsticker (i) conspired to impede the IRS in collecting federal taxes, and (ii) conspired to commit bank fraud by submitting inflated invoices to Arrow's lending bank. Count 2 charged that he evaded federal taxes. The district court sentenced him to 90 months in prison to be followed by three years of supervised release, and it further ordered him to pay restitution. On appeal, Pielsticker challenges the procedural reasonableness of his sentence and the amount of restitution. We affirm.[1]

## BACKGROUND

### I.    Charged Crimes

On February 4, 2015, Pielsticker pleaded guilty to one count of conspiracy and one count of tax evasion. The conspiracy charge set forth two independent crimes: (1) conspiracy to defraud the United States by not providing the IRS payroll taxes collected from Arrow's employees; and (2) conspiracy to commit bank fraud by obtaining bank funds with fraudulently inflated invoices for Arrow's accounts receivable. Though it did not name coconspirators in the Superseding Information, the government established that from January 2009 to December 2009, Pielsticker had conspired with Joseph Mowry, Arrow's legal counsel, and Jonathan Moore, Arrow's chief financial officer, among others.

Beginning in 2008, Arrow struggled to pay its expenses. It bounced checks to its lenders, employees, and vendors. Despite this, Pielsticker received an annual

---

[1] We grant Pielsticker's motion to seal portions of the appendix.

$1,200,000 salary and drew personal expenses from Arrow totaling $3,563,436.58, for such things as payments for his Porsche, Bentley, and Maserati automobiles. From 2009 to 2011, Pielsticker underreported his wages and failed to pay his federal income taxes, creating a personal tax debt of $1,050,956.

In January 2009, after Arrow missed a payment, Arrow's payroll-service provider dropped Arrow as a client. Rather than hire another provider, Pielsticker and Moore decided to self-report. For the rest of the year, Arrow withheld payroll taxes[2] from its employees' salaries but never sent these collections to the IRS or filed the corresponding tax returns. In total, Arrow withheld and failed to remit to the IRS $9,562,121.95 in payroll taxes.

In November 2008, Transportation Alliance Bank (the "Bank") entered into an agreement with Arrow in which Arrow sold its accounts receivable to the Bank to obtain advanced funds. Before the Bank purchased Arrow's accounts receivable, it required that Arrow submit its customer invoices, listing—among other information—the total amount owed, the account debtor's name, and the payment's due date. After receiving the invoices, the Bank would pay Arrow a percentage of the total amount owed in exchange for the exclusive right to collect on the accounts. If an account debtor failed to pay its account within ninety days of the payment due date,

---

[2] Payroll taxes are federal income taxes that an employer must deduct and withhold from its employees' wages. *See* 26 U.S.C. §§ 3102(a), 3402. An employer is liable for paying these taxes and for reporting the amounts withheld on its payroll tax returns. *Id.* § 3403. Returns for and payments of payroll taxes are due each calendar quarter. 26 C.F.R. § 31.6011(a)-1.

the Bank could force Arrow to repurchase the account (we refer to the repurchased accounts as "Recourse Accounts").

In March 2009, an Arrow billing clerk sent the Bank an invoice accidentally overstating an account receivable by about $100,000. The Bank advanced this sum to Arrow. When Moore learned of the overstated invoice, he told Mowry. Mowry advised against notifying the Bank. In May 2009, during a meeting about Arrow's finances, Pielsticker told Moore, "[w]e just need to create another invoice like we did the first time," referencing the mistakenly overstated invoice. Appellant App. vol. 3 at 459. In previous meetings, Moore suggested that Pielsticker decrease his personal expenses, but Pielsticker adamantly refused. So based on Pielsticker's request and the need to cover cash-flow shortages, Moore directed an Arrow billing clerk to overbill an invoice before sending it to the Bank.

Arrow then began intentionally overbilling invoices. Moore would determine the amounts needed to cover expenses and ask either Mowry or Pielsticker for authorization to submit inflated invoices.[3] Then, Mowry or Moore would direct the billing clerks to overstate the invoices sent to the Bank. The invoices varied in amounts, but Arrow kept track of all the overstated amounts. Initially, the clerks would inflate just one or two invoices by large amounts. But as the conspiracy continued, Moore told the billing clerks to inflate more invoices but at a lesser amount. In this way, the conspirators tried to evade the Bank's detection during

---

[3] During the sentencing hearing, Moore testified that he inflated the invoices about six to twelve times without consulting Pielsticker or Mowry.

audits. Meanwhile, Pielsticker's personal spending increased and he continued siphoning money from Arrow for himself.

By September 2009, the Bank was suspicious and demanded to verify the accuracy of Arrow's invoices by calling Arrow's account debtors directly. Initially, Pielsticker refused to allow this, but when the Bank insisted, Pielsticker, Mowry, and Moore devised a scheme to have Arrow employees answer the Bank's calls. To get away with this, they provided the Bank with a list of account debtor's fictitious phone numbers. In fact, all of the phone numbers belonged to out-of-state cell phones that Pielsticker, Mowry, and Moore had obtained to deceive the Bank. Then, they staged four to five Arrow employees who would answer the Bank's calls, identify themselves as account debtors, and confirm the overbilled invoices. In December 2009, Pielsticker, Mowry, and Moore executed the scheme a second time after the Bank wanted to verify more invoices. That same month, the bank-fraud conspiracy ended when Mowry told the Bank about the fraudulent invoices. In total, Arrow submitted false invoices to the Bank totaling at least $20,900,000.

By January 2010, Moore had begun cooperating with law enforcement. In December 2014, he pleaded guilty to conspiracy to defraud the United States and to commit bank fraud, in violation of 18 U.S.C. § 371. Hopeful that the government would recommend a more lenient sentence, Moore testified as a government witness at Pielsticker's sentencing hearing. Though Mowry also assisted law enforcement, he died before facing charges.

5

## II.    Sentencing

In February 2015, Pielsticker pleaded guilty. Soon after, the probation office prepared a Presentence Investigation Report (PSR).[4] The PSR calculated a total offense level of 28 and a criminal-history category of I, rendering an advisory guideline range of 78 to 97 months of imprisonment. On the bank-fraud conspiracy, under U.S. Sentencing Guidelines Manual § 2B1.1 (U.S. Sentencing Comm'n 2014), he received a base offense level of 6. The Bank submitted a victim impact statement, claiming losses of $11,464,560.08. Finding that Pielsticker entered the bank-fraud conspiracy in late 2009, the PSR reduced the Bank's claimed loss of $11,464,560.08 down to $7,537,948.25. Based on this amount, it assigned a 20-level increase. *See* USSG § 2B1.1(b)(1)(K) (providing for a 20-level increase when loss is more than $7 million but not more than $20 million). For his role as manager or supervisor of the bank-fraud conspiracy, Pielsticker received a three-level increase under USSG § 3B1.1(b). The total adjusted-offense level for the bank-fraud conspiracy was 29.

For the tax-fraud conspiracy, the PSR adopted the government's loss amount of $9,562,121.95. Based on this amount, it assigned a base offense level of 26. *See* USSG § 2T1.1(a)(1); USSG § 2T4.1(K) (providing an offense level of 26 for tax losses of more $7 million but not more than $20 million). Because Pielsticker failed

---

[4] The PSR applied the 2014 edition to the United States Sentencing Commission Guidelines Manual. Here, all references to the guidelines refer to the 2014 edition unless otherwise indicated.

to report his taxes, he received a two-level increase under USSG § 2T1.1(b)(1). Thus, the total adjusted-offense level for the tax-fraud conspiracy amounted to 28.

The PSR then applied additional adjustments to the greater of the two adjusted-offense levels, which was 29. First, because the conspiracy and tax-evasion counts were within four levels of each other, Pielsticker received a two-level increase under USSG § 3D1.4(a). Second, for his acceptance of responsibility, he received a three-level reduction under USSG § 3E1.1(a) and (b). Pielsticker's criminal-history score of zero placed him in Category I, resulting in a guidelines range of 78 to 97 months.

Both parties objected to the PSR and submitted depositions, records, and other information to the probation office. In addition, Pielsticker filed two motions for variance, a motion for departure, and a sentencing memorandum. The government also filed a sentencing memorandum and responded to each of Pielsticker's motions.

During the sentencing hearing, the government called Moore to testify and introduced several exhibits. When the evidentiary portion of the hearing concluded, the district court made findings on the parties' objections to the PSR and denied each of Pielsticker's objections. The district court then heard arguments from both parties on Pielsticker's motions and denied all three motions. Applying the offense level of 28, the district court imposed a 90-month sentence, to be followed by three years of supervised release, and ordered Pielsticker to make restitution for $21,026,682.03 on Count 1 and $1,050,956 on Count 2. Pielsticker appealed.

**DISCUSSION**

We review Pielsticker's sentence for reasonableness under a "deferential abuse-of-discretion standard." *United States v. Mollner*, 643 F.3d 713, 714 (10th Cir. 2011) (quoting *United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1214 (10th Cir. 2008)). "Reasonableness review is a two-step process comprising a procedural and a substantive component." *Mollner*, 643 F.3d at 714 (quoting *United States v. Verdin-Garcia*, 516 F.3d 884, 895 (10th Cir. 2008)) (internal quotation marks omitted). A challenge to the district court's application of the sentencing guidelines tests the sentence's procedural reasonableness. *Id.* Pielsticker raises four grounds to challenge the procedural reasonableness of his sentence. For the first two grounds, he disputes the district court's loss calculation under USSG §§ 2B1.1 and 2T1.1 and the amount of restitution. Third, he challenges the district court's denial of his variance motions. Fourth, he contests the district court's imposing an aggravating-role adjustment for his acting as a manager or supervisor of at least five participants in the bank-fraud conspiracy. Below, we consider each of Pielsticker's arguments and affirm.

I.     **Loss Calculation for Guidelines Purposes**

For Count 1's bank-fraud conspiracy, the district court found that the Bank suffered a loss of $11,464,560.08; and for Count 2's individual tax-fraud (grouped with Count 1's tax-fraud conspiracy), it found that the IRS suffered a loss of $10,613,077.95. Based on its finding that Pielsticker entered these offenses from the outset, the district court attributed the total bank-fraud and tax-fraud losses to him.

8

Pielsticker raises different challenges to the district court's bank- and tax-fraud loss calculations. For the bank-fraud losses, Pielsticker challenges (1) the district court's calculation methodology; (2) its finding that the total loss was $11,464,560.08; and (3) its finding that Pielsticker entered the bank-fraud conspiracy from its outset. For the tax-fraud calculation, Pielsticker challenges the district court's finding that he entered the tax-fraud conspiracy from its outset.

When a defendant objects to the district court's loss calculation, we review the district court's factual findings for clear error and its calculation methodology de novo. *United States v. Howard*, 784 F.3d 745, 748 (10th Cir. 2015). "[W]e will not disturb the district court's factual findings unless they have no basis in the record, and we view the evidence and inferences therefrom in the light most favorable to the district court's determination." *United States v. Hoyle*, 751 F.3d 1167, 1174 (10th Cir. 2014).

## A. The Bank-Fraud Conspiracy

Under the sentencing guideline for fraud, the amount of loss heavily influences the offense level. *See* USSG § 2B1.1(b)(1). Here, the district court found that Pielsticker's relevant conduct included $11,464,560.08 in bank-fraud losses. Under USSG § 2B1.1(b)(1)(K), Pielsticker received a 20-level increase for losses exceeding $7 million but not more than $20 million. Pielsticker challenges (1) the district court's calculation methodology; (2) its finding that the total loss was $11,464,560.08; and (3) its finding that Pielsticker entered the bank-fraud conspiracy

9

from its outset. We hold that the district court did not err in calculating the amount of loss and that the record supports its factual findings.

### 1. Calculation Methodology

Pielsticker challenges the district court's loss-calculation methodology associated with the bank-fraud conspiracy, arguing that the district court failed to "articulate any methodology whatsoever." Appellant Opening Br. at 50. "Loss" under the guidelines is the greater of intended or actual loss. USSG § 2B1.1, cmt. n.3(A). Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.*, cmt. n.3(A)(i). And pecuniary harm is harm that is monetary or readily measureable in money. *Id.*, cmt. n.3(A)(iii). In calculating loss, the district court "need only make a reasonable estimate of the loss . . . . [and its] loss determination is entitled to appropriate deference." *Id.*, cmt. n.3(c).

Pielsticker argues that the district court erred by failing to state its methodology. But the district court first found that Arrow's inflated invoices totaled $20,922,058.25, and then subtracted Recourse Accounts and credits to arrive at the Bank's total loss of $11,464,560.08. From this, we have no problem identifying the district court's methodology in calculating actual loss. And this methodology met § 2B1.1's direction to reduce loss by "the money returned." USSG § 2B1.1, cmt. n.3(E)(i).

Thus, we find that Pielsticker has failed to demonstrate that the district court employed an improper loss-calculation methodology.

10

## 2.     Amount of the Bank-Fraud Loss

Pielsticker challenges the district court's finding that the Bank suffered $11,464,560.08 in bank-fraud loss, arguing that this amount lacks evidentiary support. Based on the Bank's May 1, 2015 victim-impact statement, the PSR calculated $11,464,560.08 in loss. In response, Pielsticker objected to the Bank's "bare conclusion of its loss, without any supporting back-up." Appellant App. vol. 4 at 672. He also objected to the PSR, mentioning that the Bank had asserted different loss amounts over time and questioning whether the Bank had reduced its claim by legitimate invoice amounts and collections after the fraud. In its revised PSR, the probation office rejected Pielsticker's objection, explaining in an addendum that the Bank's loss calculations had decreased after "accounting for recourses and payment of legitimate invoices." Appellant App. vol. 5 at 919. The probation office acknowledged that the Bank's loss calculation had fluctuated, but noted that the calculated losses averaged $12,284,523.

Had the record ended here, we might sympathize more with Pielsticker's position. But instead the record shows that four days before Pielsticker's October 8, 2015 sentencing, Pielsticker's counsel entered into a "Stipulation Regarding Testimony of [the Bank] Representatives" to enable the court to accept the stipulation's contents as the Bank's testimony in lieu of having a representative

11

testify.[5] Appellant App. vol. 3 at 621. Included within this testimony was the following:

> During the course of the scheme, Arrow submitted false invoices to [the Bank] totaling at least $20,900,000. As a result, [the Bank] suffered a loss of at least $11,400,000. This is a conservative calculation of [the Bank's] losses resulting directly from the Accounts Receivable . . . . This loss takes into account all collection activity, including collateral obtained after Arrow closed.

Appellant App. vol. 3 at 622.

This testimony supports the district court's bank-fraud loss finding by bolstering the Bank's victim-impact statement with testimony. Using a "conservative calculation," the Bank's written testimony estimates the Bank's losses near the Bank's slightly higher[6] figure in its victim-impact statement from four months earlier. Appellant App. vol. 3 at 623. And, because Pielsticker stipulated to the written statement as the Bank's testimony, the district court was entitled to rely on it as evidence. *United States v. Spann*, 515 F.2d 579, 580-83 (10th Cir. 1975) (stating

---

[5] At oral argument, Pielsticker's counsel cryptically justified the decision to stipulate but later maintain his present position as being for tactical reasons. Oral Argument at 4:30-4:32. Whatever tactical reason Pielsticker had for stipulating—to require a remand for a more precise calculation?—his stipulation certainly means that he chose not to cross-examine the Bank's witnesses about the bases for their loss figure. His stipulating led to his present complaint—and hurt the district court's ability to hear more precise information on loss.

[6] For some reason, the Bank, in the written testimony stipulated for admission to the district court, rounded its losses to $11.4 million, rather than use the more precise $11,464,560.08 given in its victim-impact statement and used in the PSR. The Bank's written testimony described its rounded number as a "conservative estimate." Appellant App. vol. 3 at 623.

that a jury may rely on testimony admitted into evidence by the parties' stipulation in reaching its decision).

Now Pielsticker attacks the Bank's written testimony as unreliable for stating an unsupported conclusion. He argues that to calculate the bank-fraud losses properly, the district court would need to analyze each of the "hundreds, if not thousands, of inflated invoices" for fraud, for recourse payments, and for any other collections. Appellant Opening Br. at 46. In other words, Pielsticker challenges the worth of the very evidence he stipulated be admitted at sentencing. By stipulating and forfeiting any cross-examination of live testimony from Bank witnesses, Pielsticker deprived the district court, and us, of the Bank's proof in response. In this circumstance, with the Bank's written testimony properly before it, the district court had a sufficient basis to establish guideline loss. *See United States v. Abbo*, 515 F. App'x 764, 770 (10th Cir. 2013) (unpublished) (stating that a stipulation to admit into evidence a witness's testimony in lieu of live testimony "waive[s] any right to challenge the admissibility of the evidence on foundational grounds") (citing *United States v. Aptt*, 354 F.3d 1269, 1281 (10th Cir. 2004)).

Because the district court properly received the Bank's written testimony, the district court could rely on it in making its bank-fraud loss calculation.

### 3. Date of Entry into the Bank-Fraud Conspiracy

Pielsticker raises an additional challenge to the district court's bank-fraud loss calculation by disputing its finding that he entered the bank-fraud conspiracy from its outset. He asserts that he entered the bank-fraud conspiracy late, and thus was

13

responsible for a portion of the total bank-fraud loss, specifically $7,537,948.25 (as the PSR found), or less. To find that Pielsticker entered the bank-fraud conspiracy from the outset, the district court relied on Moore's testimony from the sentencing hearing. Moore testified that by May 2009, when the bank-fraud conspiracy began, Pielsticker had decided "[Arrow] just need[ed] to create another invoice like . . . the first time." Appellant App. vol. 3 at 459. And from that point on, either Mowry or Pielsticker authorized the inflated amounts that Arrow billing clerks sent the Bank.

Pielsticker doesn't dispute that Moore's testimony supported the district court's finding. Rather, he argues that the district court erred in finding Moore credible. When the district court bases its findings on determinations regarding the witnesses' credibility, "Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985). Unless the witness's story is internally inconsistent or contradicted by objective evidence or documents, we will "virtually never" reverse for clear error. *Id.*

On three grounds, Pielsticker argues that Moore's testimony was not credible. First, Pielsticker asserts that Moore gave conflicting testimony about the number of times that Pielsticker authorized the inflated amounts. The record shows that on direct examination, Moore testified that *either* Mowry or Pielsticker authorized the inflated invoices. On cross-examination, Moore clarified that Pielsticker, as opposed to Mowry, authorized the inflated invoices about 25-30 percent of the time. Despite

14

Pielsticker's contention, Moore's apportionment between Mowry and Pielsticker is consistent with his statement that either Mowry or Pielsticker authorized the inflated amounts.

Second, Pielsticker contends that an e-mail Moore sent on August 15, 2009 contradicts his testimony. In his August 15 e-mail, referring to the inflated invoices, Moore stated, "I have no guilt about the fluff." Appellant App. vol. 3 at 509. On direct, he testified that Pielsticker was a "tyrant." Appellant App. vol. 3 at 433. These statements aren't inconsistent.

Third, Pielsticker contends that statements from other Arrow employees contradicted Moore's testimony. The district court's decision to credit one individual's testimony over another's is "virtually never . . . clear error." *Anderson*, 470 U.S. at 575. And our review of the record shows that at least one of these Arrow employees lacked personal knowledge of Pielsticker's involvement in the bank-fraud conspiracy.[7]

Because Pielsticker has failed to show that Moore's testimony was "so internally inconsistent or implausible on its face," *id.*, the district court could find Moore credible. Thus, the district court did not clearly err in finding that Pielsticker entered the bank-fraud conspiracy from the outset based on Moore's testimony.

_____

[7] For example, Arrow's billing clerk, Michelle Bullard, stated in her Bank interview that she never communicated with Pielsticker about the practice of inflating invoices.

Therefore, we affirm the district court's finding that the Bank suffered $11,464,560.08 in bank-fraud loss.

## B. Date of Entry into Tax-Fraud Conspiracy

Pielsticker disputes the district court's finding that the IRS suffered $9,562,121.95 in loss for Count 1's tax-fraud conspiracy.[8] He argues that this amount lacks evidentiary support. Similar to his bank-fraud loss argument, Pielsticker specifically challenges the district court's finding that he entered the tax-fraud conspiracy from its outset. Here, too, Pielsticker asserts that he entered the tax-fraud conspiracy late, and thus is responsible for only a portion of the total tax-fraud loss. To find that Pielsticker entered the tax-fraud conspiracy from the outset, the district court relied on Moore's testimony from the sentencing hearing. Pielsticker argues that Moore's testimony was insufficient to establish that Pielsticker knowingly participated in the tax-fraud conspiracy from the outset.

"A defendant convicted of conspiracy is accountable for reasonably foreseeable conduct in furtherance of the jointly undertaken criminal activity." *United States v. Dazey*, 403 F.3d 1147, 1176 (10th Cir. 2005). The district court must make "particularized findings about, the scope of the specific agreement the individual defendant joined in relation to the conspiracy as a whole." *Id.* (quoting *United States v. Melton*, 131 F.3d 1400, 1404 (10th Cir. 1997)). A defendant is not accountable for the conduct of coconspirators "prior to the defendant joining the

---

[8] Pielsticker does not challenge the tax-loss amount for Count 2's individual tax-fraud, which was $1,050,956.

16

conspiracy, even if the defendant knows of that conduct." *Id.* (quoting USSG § 1B1.3, cmt. n.2). For sentencing purposes, the government's burden of proof is by a preponderance of the evidence. *United States v. Cook*, 550 F.3d 1292, 1294-95 (10th Cir. 2008).

The evidence was sufficient to establish that Pielsticker participated in the tax-fraud conspiracy from the outset. At Pielsticker's sentencing, Moore testified that he conversed daily with Pielsticker about Arrow's cash-flow problems and that Pielsticker decided the order in which to pay Arrow's creditors. Moore also testified that Pielsticker knew from the outset (January 2009) that Arrow was withholding payroll taxes from its employees' wages without remitting these withholdings to the IRS, yet Pielsticker still directed Arrow to pay his personal expenses ahead of the IRS. As mentioned above, the district court did not err in finding Moore credible. Thus, the record supports the district court's finding that Pielsticker entered the tax-fraud conspiracy from its outset.

## II. Restitution

Under the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A, the district court ordered Pielsticker to pay $21,026,682.03 in restitution, jointly and severally with Moore on Count 1, and $1,050,956 on Count 2. Pielsticker challenges the $21,026,682.03.[9] This amount represented the $11,464,560.08 owed to the Bank and the $9,562,121.95 owed to the IRS for Count 1's tax-fraud conspiracy. The

---

[9] Pielsticker doesn't challenge the Count 2 restitution for $1,050,956.

17

district court determined this amount based on its bank-fraud and tax-fraud loss calculations. Pielsticker argues that the government insufficiently proved its loss and restitution. We conclude that the record supports the district court's restitution order.

"We review the district court's application of the MVRA de novo and its factual findings for clear error." *United States v. Ferdman*, 779 F.3d 1129, 1131 (10th Cir. 2015). We ultimately assess a district court's restitution amount for an abuse of discretion. *Id.*

Restitution seeks to ensure that victims, if possible, "are made whole for their losses." *United States v. Parker*, 553 F.3d 1309, 1323 (10th Cir. 2009) (quoting *United States v. Arutunoff*, 1 F.3d 1112, 1121 (10th Cir. 1993)). Restitution restores actual loss but does not "unjustly enrich crime victims or provide them a windfall." *Ferdman*, 779 F.3d at 1132. "[T]he determination of an appropriate restitution amount is by nature an inexact science." *United States v. James*, 564 F.3d 1237, 1247 (10th Cir. 2009) (quoting *United States v. Williams*, 292 F.3d 681, 688 (10th Cir. 2002)) (internal quotation marks omitted). The district court may "draw inferences from the totality of the circumstances through . . . 'logical and probabilistic reasoning.'" *United States v. Ahidley*, 486 F.3d 1184, 1189 (10th Cir. 2007) (quoting *United States v. Atencio*, 435 F.3d 1222, 1232 (10th Cir. 2006)). Because the MVRA requires "information sufficient for the court to exercise its discretion in fashioning a restitution order," 18 U.S.C. § 3664(a), "[s]peculation and rough justice are not permitted." *Ferdman*, 779 F.3d at 1133 (quoting *United States v. Anderson*, 741 F.3d 938, 954 (9th Cir. 2013)). In arriving at a restitution amount, district courts decide

disputes using a preponderance-of-evidence standard, and assign the government the burden of proof. *See* 18 U.S.C. § 3664(e); *Parker*, 553 at 1323.

Contesting the restitution amount, Pielsticker complains that the district court (1) "rubber stamped" the PSR's conclusory statement of the bank-fraud loss; (2) based the bank-fraud and tax-fraud losses on its erroneous finding that Pielsticker entered the conspiracies at the outset; and (3) failed to articulate any calculation methodology. Appellant Opening Br. at 27.

For his first ground—that the district court simply "rubber stamped" the PSR's bank-fraud loss without sufficient evidence—Pielsticker relies on *Ferdman*. In *Ferdman*, the defendant was convicted of fraudulently procuring Sprint phones. 779 F.3d at 1131. Before sentencing, Sprint representatives submitted an unsworn and unverified letter to the probation office, listing Sprint's losses. *Id.* at 1133. Although it claimed lost *sales*, Sprint never provided affidavits or receipts verifying these lost sales. *Id.* at 1134. Despite this, in making its restitution recommendation, the PSR adopted Sprint's lost-sales claim. *Id.* Like Pielsticker, the defendant in *Ferdman* challenged the sufficiency of proof of the loss amount. *Id.* Faced with the defendant's objection, the government simply relied on the PSR and didn't introduce supporting evidence. *Id.* at 1135. After the district court adopted the PSR's restitution figure, we reversed, concluding that "[t]he record contains no actual proof, not even an affidavit, of what those expenses were." *Id.* at 1140.

Pielsticker's restitution order is stronger in at least two ways. First, unlike in *Ferdman*, here the district court had testimony to support its loss finding. After

19

Pielsticker first challenged the Bank's figures for its bank-fraud losses, he stipulated to the Bank's written testimony, bolstering the PSR's and victim-impact statement's figure. Because the district court may "draw inferences from the totality of the circumstances" in exercising its discretion, *Ahidley*, 486 F.3d at 1189, it could infer that the Bank rounded its loss estimate to $11,400,000 in its written testimony and gave the precise amount of $11,464,560.08 in its victim-impact statement. We also note that Pielsticker himself credited the precise figure in his objections to the PSR estimating the loss attributable to him as "38.36 percent of $11,464,560." Appellant App. vol. 5 at 918. Thus, we cannot say that the district court abused its discretion in relying on the testimony and ordering the sum it did as restitution. Second, unlike in *Ferdman*, the district court had no need to value property such as phones or to determine a valuation method for lost profits. 779 F.3d at 1134. Here, the district court's task was much simpler—to determine the total overbillings and then subtract recourses or credits. The district court did just that. And, in doing so, it could rely on the calculation set out in the Bank's testimony that Pielsticker stipulated be admitted into evidence. Once the district court had this sufficient basis behind its restitution amount, it acted in its discretion to adopt that amount.[10]

---

[10] To show an abuse of discretion on appeal, Pielsticker needs to show that he did more at sentencing than generally object. Pielsticker chose not to cross-examine a Bank witness offering live testimony about the restitution calculation. In addition, he chose to present nothing undermining the Bank's evidence that he stipulated be admitted as a government exhibit at the sentencing hearing. In this regard, we observe that Pielsticker knew which invoices Arrow had inflated and which debtors

Pielsticker's second ground—that the district court erred in finding that Pielsticker entered the conspiracies at the outset—is a factual finding that we review for clear error. *United States v. Masek*, 588 F.3d 1283, 1287 (10th Cir. 2009). In finding as it did, the district court found Moore credible and relied on his testimony. "We give the district court's determinations regarding the credibility of witnesses great deference." *Id.* at 1288 (quoting *Wessel v. City of Albuquerque*, 463 F.3d 1138, 1145 (10th Cir. 2006)). Under our deferential review, we find no error in the district court's finding that Pielsticker entered the conspiracies at the outset.

For his third ground, Pielsticker asserts that the district court failed to articulate a calculation methodology. Under the MVRA, the district "court must use actual loss as its metric." *Id.* As we stated above, where the district court first found that Arrow's inflated invoices totaled $20,922,058.25, and then subtracted Recourse Accounts and credits to arrive at the Bank's total loss of $11,464,560.08, we see the district court's methodology clearly. Thus, the district court did not abuse its discretion in ordering Pielsticker to pay $21,026,682.03 in restitution on Count 1.

## III. Motions for Variance

Pielsticker filed two pre-sentence motions for variance.[11] After hearing arguments from both parties at sentencing, the district court denied the motions. We

associated with those invoices could testify about credits and recourses. After all, Moore and the billing clerks kept track of the overbilled amounts on a spreadsheet.

[11] Pielsticker also filed a motion for downward departure, which the district court denied. He failed to challenge this on appeal.

review the district court's decision to grant or deny a request for variance for an abuse of discretion. *United States v. Haley*, 529 F.3d 1308, 1311 (10th Cir. 2008) (reviewing the district court's denial of a variance motion for an abuse of discretion). A district court abuses its discretion when it renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable. *Id.*

## A. Medical-Condition Variance

Pielsticker based his first motion for variance on his heart condition. He argues that the district court unreasonably denied the motion for variance by failing to consider the 18 U.S.C. § 3553(a) factors. In his motion and during sentencing, Pielsticker presented evidence that he relies on an implant to shock his heart when it fails or becomes arrhythmic; and that he needs to replace the implant. His treating cardiologist stressed that Pielsticker was at a "GREAT risk of death" and worried how prison might affect his medical condition. Appellant App. vol. 1 at 73-74.

As a matter of procedural reasonableness, because Pielsticker's sentence falls within the advisory Guidelines' range, § 3553(c) requires that the district court state "the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c); *United States v. McComb*, 519 F.3d 1049, 1054 (10th Cir. 2007). The district court meets this threshold when it provides a "general discussion"[12] of the § 3553(a) factors. *Geiner*, 498 F.3d at 1113. Despite Pielsticker's contention that the district

---

[12] Though we also noted that this "is not necessarily the best practice." *United States v. Geiner*, 498 F.3d 1104, 1113 (10th Cir. 2007).

22

court failed to consider the § 3553(a) factors, the record shows that the district court provided more than a general discussion.

Without explicitly listing the § 3553(a) factors, the district court considered the need "to provide the defendant with . . . medical care." 18 U.S.C. § 3553(a)(2)(D). Based on a Bureau of Prisons' (the "Bureau") representation, the district court found that Pielsticker could have his implant replaced in a federal medical facility. It also found that Pielsticker's "heart condition is not so extraordinary or unusual as to distinguish [his] case from typical cases covered by the guidelines." Appellant App. vol. 3 at 585. Evidence from the record supported this finding, including (1) Pielsticker's failure to have surgery within the eight months leading up to sentencing; (2) the Bureau's representation that it had a federal medical facility capable of performing the replacement;[13] and (3) Pielsticker's ability to engage in normal life activities. Thus, the district court did not abuse its discretion in denying Pielsticker's first motion for variance.

---

[13] Pielsticker argues that the Bureau's representation is "a double hearsay *ex parte* communication about a mission-critical fact." Appellant Opening Br. at 43. But at sentencing, the district court can credit "relevant information without regard to its admissibility . . . provided that the information has sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3(a); *see United States v. Friedman*, 499 F. App'x 807, 810-11 (10th Cir. 2012) (unpublished) (finding that the record suggested no prejudice from an assumed *ex parte* communication with the United States Marshals).

## B.    Anticipated-Amended Loss Table

Pielsticker based his second motion for variance on a pending amendment to the 2015 sentencing guidelines. As mentioned above, the district court applied the 2014 sentencing guidelines, which imposed a 20-level enhancement for losses of more than $7 million and not more than $20 million. USSG § 2B1.1(b)(1)(K). Beginning November 1, 2015, an amendment to the fraud-loss table in USSG § 2B1.1 increased the threshold for a 20-level enhancement from $7 million to $9.5 million. USSG § 2B1.1(b)(K) (U.S. Sentencing Comm'n 2015). Based on Pielsticker's assuming that the district court erred by finding that he entered the bank-fraud conspiracy at its outset, he argues that the district court ignored the "parsimony principle" of § 3553(a) by not applying the 2015 guidelines. Appellant Opening Br. at 38. This argument fails because the district court did not abuse its discretion in finding that Pielsticker joined the conspiracy at its outset, *see supra* Discussion Sections I(A)(2), and (3).

## IV.    Manager or Supervisor Enhancement

For his role as a "manager or supervisor" of a conspiracy consisting of five or more participants, Pielsticker received a three-level increase under USSG § 3B1.1(b).[14] Pielsticker argues that the district court clearly erred in finding that he was a manager or supervisor of the bank-fraud conspiracy under USSG § 3B1.1(b)

---

[14] USSG § 3B1.1(b) states in part as follows: "If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels." (emphasis added).

because the evidence was insufficient to support the enhancement. He contends that (1) the conspiracy consisted of fewer than five participants, and (2) that Moore supervised or managed the conspiracy.

We review the district court's fact findings for clear error. *United States v. Zar*, 790 F.3d 1036, 1056 (10th Cir. 2015). In doing so, we view the evidence in the light most favorable to the district court's finding. *United States v. Mozee*, 405 F.3d 1082, 1088 (10th Cir. 2005). Only if "on the entire evidence, we are left with a definite and firm conviction that a mistake has been committed" will we reverse. *Zar*, 790 F.3d at 1056 (quoting *United States v. James*, 592 F.3d 1109, 1113 (10th Cir. 2010)).

First, in determining the number of participants, the guidelines define "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." USSG § 3B1.1(b), cmt. n.1. Because the defendant counts as a participant, the district court properly counted Pielsticker as one of the five participants. *United States v. Hardwell*, 80 F.3d 1471, 1496 (10th Cir. 1996) ("In determining whether there were five or more participants, the defendant is included."). And Pielsticker acknowledges that Moore and Mowry also counted; but he contests whether other Arrow employees qualified. Over Pielsticker's contention, we find that the record supports the district court's finding that Elaine Cox, Michelle Bullard, and Tom Webster also acted as participants.

As for criminal responsibility, in their interviews with the Bank, Cox and Bullard admitted that they inflated invoices for Arrow. Specifically, Cox testified

25

that, "each day either Michelle or myself was given a dollar amount we were supposed to bill for that day." Appellee App. at 38. And Bullard testified that, "we would just inflate like two invoices, maybe just one invoice, for a very large dollar amount." Appellee App. at 12. Similarly, in his FBI interview, Webster said that he had answered calls for the Bank audit, posing as an Arrow customer to reassure the Bank that the inflated invoices were legitimate. Thus, the record supports the district court's finding that the bank-fraud conspiracy involved at least five participants.

Second, Pielsticker disputes whether he was a manager or supervisor of the bank-fraud conspiracy. If Pielsticker "exercised any degree of direction or control over someone subordinate to him," then he qualifies as a manager or supervisor. *United States v. Backas*, 901 F.2d 1528, 1530 (10th Cir. 1990). His supervision of just one other participant satisfies the definition. *United States v. Cruz Camacho*, 137 F.3d 1220, 1224 (10th Cir. 1998).

The record supports the district court's finding that Pielsticker was a supervisor or manager of at least one other participant. In his FBI interview, Webster recounted answering the Bank's audit calls to validate the inflated invoices. After answering calls the first time, he told Pielsticker that Moore had asked him to answer calls a second time. To this, Pielsticker responded, "do it." Appellant App. vol. 2 at 230. This command shows that Pielsticker exercised some degree of direction or control over Webster. Thus, the district court properly found that Pielsticker was a manager or supervisor.

26

## CONCLUSION

For the reasons stated above, we AFFIRM Pielsticker's sentence and the district court's restitution order.

Entered for the Court

Gregory A. Phillips
Circuit Judge